## City of Erie, Appellant, v. The Public Service Commission.

Argued November 19, 1928.

Before HENDER-
SON, TREXLER, KELLER, LINN, GAWTHROP and CUNNING-
HAM, JJ.

*S. L. Gilson,* Special Counsel for City of Erie, and
with him *T. P. Dunn,* Assistant City Solicitor, and *J.
B. Held,* City Solicitor, for appellant.

*E. Everett Mather,* Assistant Counsel, and with him
*John Fox Weiss,* Counsel for the Public Service Com-
mission.

*Charles H. English,* and with him *Frank. B. Quinn, Raymond P. Leemhuis* and *Clark O. Tayntor,* attorneys for Mutual Telephone Company, intervening appellee.

OPINION BY CUNNINGHAM, J., March 1, 1929:

The City of Erie, appellant herein, was the complainant in a proceeding before the Public Service Commission, in which an increase in the rates of the Mutual Telephone Company for its service in the City and County of Erie was attacked as ''excessive, unfair, unjust and unreasonable,'' and violative of our Public Service Company Law. The new schedule was filed March 2, to become effective April 1, 1926, and the complaint was filed March 24, thereby casting upon the utility the burden of showing the reasonableness of the increase in its rates. A number of hearings were conducted by the commission between June 3, 1926, and May 8, 1927. On January 4, 1928, the commission filed its report and order dismissing the complaint, from which order we have this appeal by the City of Erie.

The company contended before the commission that the fair value of its property for rate making purposes, as it existed on August 31, 1926, and based upon its reproduction cost, less accrued depreciation, was at least $5,023,494. Appellant contended that its fair value upon that basis was only $4,251,828. The company, however, insisted that the reproduction cost of its property, without any deduction for depreciation, namely, $5,714,060, should be considered as a proper rate base—a contention which the commission properly rejected. The commission found that the fair value of the company's property as of August 31, 1926, was $4,825,000. Upon this amount it allowed a seven per cent. rate of return, or $337,750 per annum; made an allowance of $548,762 for annual operating expenses and an allowance of $150,000 for annual de-

preciation, or a total of $1,036,512 as the annual revenue the company might reasonably be permitted to collect from the users of its service.

During the progress of the proceeding before the commission it was estimated that the rates in the new schedule would produce approximately $1,018,463 annually; to this the commission found should be added $980 of non-operating revenue (rents); and the commission therefore estimated the total annual revenue which the new schedule might reasonably be expected to produce at $1,019,443. It subsequently developed, as a result of the actual experience of the company under the new rates for the first year—April 1, 1926, to March 31, 1927,—that they produced $1,029,843 as operating income. If the same amount of non-operating income be added, and no deductions made for uncollectible items, the total revenue under the new rates for the first year they were in operation would be $1,030,823 or $5,689 less than the allowable revenue fixed by the commission. Appellant contends that this result is due to the fact that the commission not only fixed the rate base at an unreasonably high figure but also made an excessive allowance for annual operating expenses, including taxes. No question of confiscation is involved in this case; the complaint is in behalf of ratepayers and it therefore becomes our duty upon this appeal to inquire only whether the commission has "arbitrarily fixed the rates contrary to evidence, or without evidence to support it, or in a grossly unreasonable manner": Lewistown Borough v. Public Service Commission, 80 Pa. Superior Ct. 528, 533, and cases there cited. The form of the assignments of error as printed in appellant's brief should not be permitted to pass without comment. The first and second relate to the final order and are not objectionable but the third, fourth and fifth are drafted in terms so general that they fail to afford us any indication of the specific findings of the com-

mission which appellant deems erroneous. For instance, by the third it is averred that the commission "erred in its finding that the fair value of the properties of the Mutual Telephone Company was $4,825,-000," and then follows merely a quotation of the general finding. No attempt is made to specify the items which appellant contends were improperly included in the rate base. By the fourth assignment it is charged that the commission erred in making an allowance of $548,762 for operating expenses but there is no specification of any item or items which should not have been allowed or which should have been included at a lower figure than that fixed by the commission. The fifth is open to the same objection. The petition on this appeal, in which the appellant should have set forth "specifically and concisely the error or errors assigned to the finding, determination, or order of the commission," has been improperly omitted from the printed record. We have, however, examined the original petition as returned with the record and find that it contains fifteen assignments of alleged errors, many of which are in general terms. From a consideration of the assignments, petition and appellant's statement of the questions involved we gather that its material complaints are that the commission erred in these five particulars:

1. Including in the rate base an item of $99,546 for property—the Ninth Street Exchange—which is no longer used or useful;

2. Including in its finding of fair value the sum of $245,000 as cost of financing;

3. Finding the sum of $190,000 to be reasonable and necessary for working capital;

4. Including in its finding of fair value the sum of $657,444 as representing the additions made to plant facilities between October 1, 1925, and August 31, 1926, which item appellant contends should not have exceeded $405,496;

5. Allowing $548,762 for annual operating expenses, including federal and other taxes, and exclusive of the allowance for annual depreciation.

Several other matters are discussed in appellant's brief, among them being the propriety of including in the allowance for operating expenses all federal and state taxes and at the same time allowing a seven per cent. return. The commission has not made any specific findings with respect to the matter of taxes and it does not appear that the question which appellant now seeks to argue was raised before the commission. Even if we assume that the federal income tax and the state tax on corporate loans were both included in the allowance for operating expenses, the record does not contain the data necessary for a disposition of the questions appellant now endeavors to raise. Moreover, the learned counsel for appellant state in their brief, in connection with their discussion of operating expenses, that "the appellant [does] not contend that this sum [$548,762] included any improper expenditures, but [does] contend that expenditures in large amounts were made for purposes which would not occur again, at least for many years." Under all the circumstances we must decline to consider the question of taxes upon this appeal. Nor are we concerned in this case with the matter of going concern value as the amount fixed by the commission for this item is $40,000 less than the amount suggested as proper by appellant's witness. Another somewhat subsidiary contention of appellant is that the company should be charged with interest at five per cent. "on funds collected through rates for purposes of depreciation and used for capital extensions upon which a rate of return is permitted." It is not suggested that the amount of the accumulations in the depreciation reserve should be considered in connection with the rate base, as in the case of City of York v. The Public Service Commission, 85 Pa. Superior Ct. 139, nor

that all of the reserve should be charged with interest, but, in the language of appellant's counsel, "only that portion which has been collected through rates for the purpose of meeting depreciation charges and has been invested in additional plant." As the record indicates that it is the practice of the company to figure its depreciation on the straight line, as distinguished from the sinking fund, basis, we are not persuaded that this contention of appellant is well founded.

A brief reference to the history of the company is necessary to the disposition of the five above stated substantial questions involved upon this appeal. The Mutual Telephone Company was organized in 1898 to furnish telephone service in the City of Erie and vicinity. The Bell Telephone Company of Pennsylvania was engaged in a similar service in the same territory and a competitive situation existed. By March, 1926, the Mutual Company, which began operations with 300 telephones, had approximately 18,839 telephone stations in operation in the City of Erie and the Bell Company something over 3,000 stations. The Mutual Company owned a telephone exchange building on Ninth Street, referred to in paragraph one of our statement of questions. On April 1, 1926, an arrangement became effective by which the Mutual Company absorbed the Bell Company in this territory and the latter ceased its operations therein. As a result of this purchase the Mutual Company acquired some 3,155 additional stations and, as stated in appellant's brief, "moved its exchange, including switchboards, cables, accounting system and administration offices, into its new building [on E. 10th St.], abandoning the old exchange and office building ...... [and] issued sufficient bonds to finance the construction of the new building and purchase of the Bell properties." At the expiration of one year following the consolidation the Mutual Company had 20,514 telephones in the

City of Erie and 4,127 in Corry, Girard and other places in Erie County.

1. The removal from the old to the new exchange building and the alleged abandonment of the former gave rise to the controversy over the inclusion by the company of both buildings in its estimates. It included the old exchange building in its valuation at a reproduction cost, less depreciation, of $99,546. Appellant contending that this building was no longer used or useful omitted it entirely from its appraisement. In disposing of this contention the commission said: "The commission agrees with complainant that this item of property is not substantially used or presently useful. Making this deduction from the direct construction costs, it appears that the parties differ by less than $9,000, which amount is distributed over numerous small items and may be considered negligible." It is now contended by appellant that, although the commission says it excluded this item in arriving at the rate base, it did not in fact do so. We are therefore required to examine the evidence and exhibits of the parties bearing upon their respective contentions as to what physical property was actually included by the commission. The foundation for the estimates of both parties is an inventory of the company's property as of October 1, 1925, and the parties are in accord that an amount equal to 16.77 per cent. of the direct construction costs fairly indicates the amount to be added for indirect construction costs, or overheads, and also agree that the accrued depreciation may properly be measured by a percentage of 14.4. An examination of the testimony and the respective exhibits of the parties satisfies us that they do not differ materially in their estimates of the direct undepreciated cost of the physical property. From one of the consolidated exhibits of the company it appears that its estimate of the direct construction cost of the Erie City property is $2,763,487 and of the

property outside of the city $746,570, or a total of $3,510,057. By appellant's exhibit it is shown that its estimate of this cost is $3,501,288. The difference of $8,769 is probably due to the omission from the inventory upon which appellant's figures are based of a quantity of iron wire. For the purpose of testing appellant's claim that the old exchange building is included in the commission's finding of $4,825,000 as the rate base, we may start with the direct construction costs of the physical property at the above figure of $3,510,057. Deducting from this amount the agreed upon cost of the building in question, $99,546, there remains a direct construction cost of $3,410,511 for used and useful property. To this is to be added indirect construction costs at 16.77 per cent., or $571,942, making the total cost of used and useful property $3,982,453. When 14.4 per cent., the agreed percentage for accrued depreciation, or $573,473, is deducted, there remains as the depreciated cost of the used and useful property the sum of $3,408,980. The company contends, and the commission found, that items should be added to this amount for going concern value, cost of financing, working capital, additions to property since the date of the inventory and for miscellaneous investments, in order to ascertain a proper rate base; appellant contends that nothing should be added for cost of financing or miscellaneous investments and differs with the company and the commission with respect to the amounts for going concern value, working capital and additions to the property. The commission fixed going concern value at $300,000, cost of financing $245,000, working capital $190,000, additions to property $657,444, and miscellaneous investments $15,131. When the aggregate of these amounts is added to the above figure of $3,408,980 as representing the practically agreed upon depreciated cost of used and useful property, the total is $4,816,555. This total is so close to the commission's finding of $4,825,000

that it seems to us to demonstrate conclusively (even if the adjustment in the inventory be disregarded) that the commission did not include in its finding the cost of the Ninth Street exchange building.

2.  The commission included $245,000 in the rate base as representing "cost of financing." The evidence from which any conclusion may be drawn concerning this item is very meager. About all we have is the fact that on December 31, 1926, the bond issue was $1,632,527 and the fact that the company carried on its books an annual item of $3,125 for amortization of "debt discount and expense." The company, through its engineer and by its exhibits, claimed that seven and one-half per cent. of the undepreciated reproduction cost, plus miscellaneous investments, or $339,531, should be allowed. Its main justification for this contention seems to be the fact that in determining the fair value of the properties of the Philadelphia Rapid Transit Company and Ohio Valley Water Company some years ago the commission used this percentage. Appellant, through its engineer, urged that nothing should be included here for this alleged element of value because the company in the past had followed the usual commercial practice of amortizing its bond discount over the life of the bonds. We are not impressed with this argument, particularly as it has been held that the cost of marketing bonds should be allowed as a capital charge: Ben Avon Borough v. Ohio Valley Water Company, 68 Pa. Superior Ct. 561, 592, affirmed in 271 Pa. 346, 357. No testimony was presented in this case indicating the original cost of the property; both parties adopted the reproduction cost theory. When evidence of original cost is introduced as a factor in determining present fair value it is obviously quite proper to consider the actual experience of the company in the matter of the cost of obtaining money and in such cases it has been consistently held that mere theoretical

or hypothetical costs of this nature are not to be included. Cost of financing is however an element of value to be considered in a reproduction cost estimate. It is a definite item of cost and by the introduction of the testimony of witnesses familiar with the cost of issuing and marketing securities it should be possible to determine it with substantial accuracy; it may differ materially in different properties and under different plans of financing. The ratio of stocks and bonds to the total capitalization, affecting as it does the margin of safety, necessarily has a material bearing upon the cost of securing money. But no attempt was made in this case to show what it probably would cost to procure sufficient capital to reproduce the company's present property under the different financial plans which might reasonably be adopted. The commission states in its report that appellant does not include in its estimate a specific amount for this item, "but does mention five per cent." Counsel for appellant deny in their brief that any percentage was suggested and we have been unable to find any justification in the record for this statement by the commission. We are therefore at a loss to understand upon what basis the commission fixed its allowance of $245,000. We are of opinion that an item of this character should be included in ascertaining the rate base in this proceeding, but the only evidence we have been able to find indicative of the amount at which it should be allowed is that in behalf of the company suggesting $339,531. As already indicated, that evidence is unsatisfactory but is sufficient to show that the element of fair value we are now considering is present. We are convinced that any result which might be obtained by returning this record for additional testimony and specific findings on this item would not materially affect the finding as to fair value, and have therefore concluded that to return the record

would only prolong the litigation without any benefit to appellant.

3. The next inquiry is whether there is evidence to justify the finding that $190,000 is a reasonable allowance for working capital to care adequately for the operating conditions of the future. In appellant's exhibit this item is fixed at $106,116. Its engineer based his figures upon "the average of the operating and purchasing accounts for a period of three years, including 1926," which was $77,366, and added thereto his estimate of operating expenses for one month. On the other hand the company's engineer, referring to the city exchange alone, submitted a figure of $150,000 with this explanation: "The allowance I have made for working capital was considered from the viewpoint of the necessary stores and supplies and materials, reasonably necessary in the conduct of the business, plus a small allowance of cash on hand to maintain reasonable credit at the banks. The company, prior to the absorption of the Bell properties and for the two years immediately prior had approximately $100,-000 of stores and supplies on hand at all times and I believe, and consider it equitable, that after the merger a little larger amount would be necessary, due to the fact that the properties were very nearly doubled, so I allowed $125,000 as a reasonable amount for the stores and supplies to be kept on hand and the nominal sum of $25,000 in cash for credit standing at the banks, making a total of $150,000 for working capital." Testifying later and with reference to the entire property this witness suggested $190,000, "based on $150,000, the estimate given at a previous hearing when I testified as to the Erie Exchange only and calculating a corresponding ratio to the outside properties as the total physical properties bear to the physical property of the Erie exchange, thus reaching a working capital in the amount of $190,000." By reason of the consolidation, the requirements of

the company in the past do not furnish a very substantial basis for an estimate of what it will need in the future. The evidence indicates that its physical property has been largely increased; from July 1, 1924, to April 1, 1926, there was an increase of nearly 5,000 telephones in the city exchange. The balance sheet of the company as contained in one of appellant's exhibits shows the item of "materials and supplies" as of December 31, 1926, to have been $155,-167. We think there was satisfactory evidence to support the conclusions of the commission upon this item.

4. The company claimed, and the commission held, that $657,444 should be included in the rate base for additions made to its plant between October 1, 1925, the date of the inventory, and August 31, 1926, the date adopted by the commission for determining the capital structure. That such expenditures were actually made was not disputed, but appellant's witnesses contended that the amount of this item should be ascertained by adding to the total amount of the additions between October 1 and December 31, 1925, viz., $34,385, one-half of the additions made during the calendar year 1926. The expenditures for additional facilities during 1926 aggregated $742,221; appellant's engineer took one-half of this amount, $371,110, and, adding the above figure of $34,385, suggested $405,495 as the proper allowance for this item. He states that he took one-half of the additions during 1926 to give him "the amount which fairly reflects the value of the property from the beginning of the year to the close of the year" and that "much of this structure was in use only a short period and the average would be one-half year." The difficulty with appellant's theory is twofold. In the first place the commission's problem was not to approve rates which would be reasonable for the year 1926 alone, but such rates as will probably give a reasonable return on the value

of the property as determined at the time of the investigation and for at least three years in the future. Secondly, the evidence shows that a large part of the additional expenditures were for the new Tenth Street exchange building which was occupied April 1, 1926, and for its equipment. These expenditures were $531,664, and, along with the additions made between October 1 and December 31, 1925, represent $566,049 of the total of $657,444 approved by the commission. An additional $100,000 does not seem unreasonable for the period from April 1 to August 31, 1926. In our opinion the evidence fully sustains the action of the commission in this connection.

5. The ascertainment of a proper allowance for annual operating expenses in this case is complicated and rendered unusually difficult by reason of the consolidation of the two systems on April 1, 1926. The commission allowed $548,762. The actual operating expenses as shown by one of appellant's exhibits for 1926 were $668,152, including annual depreciation. This figure covers only nine months' operation of the combined properties. An analysis of the evidence and exhibits indicates that the operating expenses of the entire property for the eleven months from April 1, 1926, to March 1, 1927, exclusive of depreciation, were about $532,388. By adding what seems to us to be a reasonable estimate for the additional month, the total for the first year's operation of the combined facilities will approximate $593,000. The basis of the main attack upon the company's claim for operating expenses is that these costs for 1926 necessarily include items incident to the purchase and cutting in of the Bell system and the making of numerous adjustments which will not be incurred in future years. There is force in this suggestion, but it is of little practical use to us in the absence of a specification by appellant of the particular items which, in its opinion, have been included without sufficient evidence

that they will probably be incurred from year to year. Nor does it assist materially to point to the fact that the operating expenses, exclusive of depreciation, of the Mutual Company alone were only $281,984 in 1925, $208,187 for 1924, and $195,820 for 1923, or to show the average cost per station in those years under the operating conditions then existing. In connection with this subject the commission said: "It may be that the operating costs for 1925 and 1926 contain certain elements incident to the consolidation which will not annually re-occur, but the amount of such expenditures, if they exist, was not convincingly established. Moreover, it is not clear that the improved character of service will not entail other expenditures of at least equal amounts." Of course the burden was on the company to show by competent evidence that its claim was reasonable, but, upon this appeal, we are entitled to have a specification of the items which appellant contends should have been excluded by the commission and of those which should have been included at lower figures. We have not been referred to any complete estimate by appellant's witnesses or counsel of what they contend would be a proper allowance. In Wayne Public Safety Association v. The Commission et al., 94 Pa. Superior Ct. 228, we had occasion to consider the quantity and quality of evidence necessary to sustain an allowance by the commission for operating expenses and, citing Schuylkill Railway Company v. The Commission et al., 71 Pa. Superior Ct. 204, said, at page 235: "There is no statutory designation either of the kind or quality of the evidence required to induce a decision by the Public Service Commission, and it would be impractical to specifically define the quantity necessary to produce that result. It must be sufficient, however, to satisfy a reasonable mind that the fact is as alleged. The law vests in that body the authority to exercise its judgment, and it is that, rather than the opinion of

this court, which is to control the subject, if the order be within the power of the commission, and it is not unreasonable." Upon a consideration of the evidence and exhibits relating to this branch of the case, we cannot say that the allowance made by the commission is without evidence to support it or contrary to any persuasive evidence on the record. If experience should demonstrate that it is too high, appellant will not be without remedy.

For the reasons stated, we are of opinion that the order of the commission challenged upon this appeal is reasonable and in conformity with law and therefore dismiss all the assignments.

Order affirmed.