Chambersburg Gas Company et al., Appellants, *v.*
Public Service Commission.

198

Argued May 5, 1933 and October 19, 1934.

Before Keller, Cunningham, Baldrige, Stadtfeld and Parker, JJ.

*Frederick L. Ballard,* with him *John V. Lovitt,* of *Ballard, Spahr, Andrews & Ingersoll,* and *Sharpe & Sharpe,* for appellant company.

*Douglass D. Storey,* of *Hause, Evans, Storey & Lick,* and with him *Edmund C. Wingerd,* for intervening complainant.

*E. Everett Mather, Jr.,* Assistant Counsel, with him *Paul H. Rhoads, Samuel Graff Miller,* Legal Assistants and *John Fox Weiss,* Counsel, for Public Service Commission.

OPINION BY PARKER, J., February 1, 1935:

The Chambersburg Gas Company has supplied manufactured gas to the public in the Borough of Chambersburg since 1856, and through a subsidiary, Associated Gas Company, has extended this service to a few consumers in adjacent townships. On May 1, 1929, the company filed with the Public Service Commission a new schedule of rates to become effective June 1, 1929. Prior to the effective date of the tariff, complaints were filed by the Borough of Chambersburg and the Commercial Club of Chambersburg, alleging that the rates were unreasonable, discriminatory, and unduly preferential to certain customers. The Public Service Commission heard testimony at different times over a period from February to December, 1931, and on November 15, 1932, handed down its report and

order, whereupon appeals were taken by the company and borough from the findings and order of the commission.

After argument this court, without passing on the questions involved, remitted the record to the commission for the purpose of affording the utility an opportunity to offer additional evidence bearing on the single question of the existence of a lag in the development of the company's business as affecting its right to have an allowance for "going concern value." The commission received such evidence and filed an order dealing with that subject, and each side again appealed. From whatever angle the questions are viewed, this leaves for our determination at the present time all of the questions involved in the appeals. These appeals were argued together and will be disposed of in one opinion.

The appeals involve the treatment of and the valuations fixed by the commission on certain items concerning fair value and gross and net income. Objection is also made to the order of the commission on the ground that it required the company to file a tariff which, it is alleged, will not yield the return that it was entitled to receive under its findings. We will confine our attention to such items as are covered by the assignments of error pressed upon the oral argument and in the printed briefs, first considering those disputed items making up the total sum allowed for fair value. In compliance with the amendment of June 12, 1931, P. L. 530 (66 PS 836), it is required of us that we "consider the entire record of the proceedings before the commission, including the testimony, and, on its [our] own independent judgment, to determine whether or not the findings made and the valuations and rates fixed by the commission are reasonable and proper." Such values are to be determined as of the time the order was made.

The commission fixed such fair value as follows:

Physical Property:

| | |
|---|---:|
| Items agreed upon by parties, ........ | $83,725 |
| Land and Right of Way, ............ | 8,280 |
| Regulator House, ................. | 460 |
| Oil Storage Tanks, ................. | 7,018 |
| Relief Holder, ..................... | 16,654 |
| Storage Holder, ................... | 35,051 |
| Purification Apparatus, ............ | 11,501 |
| Distribution System Piping, ......... | 133,131 |
| Service Lines, ...................... | 31,023 |
| Meters in Service, .................. | 38,433 |
| Meters in Stock, ................... | 2,063 |
| Additions and Betterments, ......... | 14,750 |
| Materials and Supplies, ............ | 3,371 |
| Working Capital, .................. | 6,365 |
| | |
| Physical Property ............... | $391,825 |
| Overhead Costs of Organization and Construction, .......................... | 60,212 |
| Cost of Financing, .................... | 13,561 |
| | |
| Reproduction Cost New, as of July 1, 1929, | $465,598 |
| Depreciation to same date, 14% plus, .... | 65,000 |
| | |
| Value, July 1, 1929, .................... | $400,598 |
| Deduction for change of price between July 1, 1929, and date of filing report, November 15, 1932, ........................ | 20,598 |
| | |
| Fair Value ...................... | $380,000 |

Neither of the parties, in endeavoring to fix the fair value of the property, offered evidence of original or historic cost, and such cost can therefore not be determined. They depended, with slight exceptions, upon estimates of the cost of reproduction new, less

accrued depreciation. The reproduction cost was first calculated as of July 1, 1929, to which was added the book cost of additions to the fixed capital from that date to December 31, 1930, property retired during the same period being deducted from the inventory and appraisement. Each of the parties called an engineer experienced in the valuation of public service properties such as we have under consideration and depended very largely on their evidence to fix such values. Likewise, the parties did not depend upon theoretical estimates of accrued depreciation, but offered evidence as to the actual physical condition of the property when examined. For this purpose the property was inspected and, where necessary, excavations were made to permit the examination of buried lines and the like. The commission followed the plan adopted by the parties in arriving at its ultimate results.

The percentage of accrued depreciation claimed by the company was 7.8 per cent, by the complainants 17.76 per cent, while the commission allowed 14 per cent plus. Our independent judgment is in accord with that of the commission in this respect. The weight of the testimony on this subject was with the complainants. We regard the examination of the complainants' engineer in this respect as more exhaustive and his results as more satisfactory. In the appraisements submitted, no distinction was made between obsolescence and depreciation. The engineer for the company frankly admitted that his allowance for depreciation covered only the visible effects of wear and tear and made no allowance for obsolescence. It does not seem reasonable that a company could have been operating since 1856 with some parts of its property still in use, and that account should not be taken of obsolescence as well as wear and tear in determining present value. We understand that the plant was largely recon-

structed about 1882, which is a considerable age in these days of rapid improvement in manufacturing processes. In approving the precentage fixed by the commission, we have given due weight to all the evidence and are convinced that the allowance is reasonable.

The commission was required under the law to fix the fair value approximately as of the date of the filing of its order (Willcox v. Consolidated Gas Co., 212 U. S. 19; Georgia Ry. v. R. R. Comm., 262 U. S. 625, 631; McCardle v. Indianapolis Co., 272 U. S. 400, 409), but as the rates affect the future at least for a time, consideration must be given to other elements, including past history and trends, as well as to the immediate present in order that a reasonable rate may be established on a plant reasonably necessary for the services rendered. The complainants having furnished evidence showing the trend of prices between July 1, 1929, and December 31, 1930, as well as the prices in effect on the later date, the commission in reaching its final result gave effect to such facts. On this subject the commission said: "It is, of course, difficult to establish the degree of accuracy of this trended estimate applied to a specific property. However, it is a matter of common knowledge of which the commission takes notice that there was a general drop in price levels in this period and that the downward trend has continued until the present time. ...... The commission is of the opinion that this general change in prices, a matter known to all our people, should be taken into consideration in establishing the value of this property. This does not mean, however, that it must be taken as an exact indicator of present value. We consequently conclude that the present fair value of respondent's property for rate making purposes is $380,000. This judgment figure is equivalent in effect to averaging prices for the high price period

in 1929 with the low prices of the present time, but still giving more weight to the higher prices which persisted over a longer number of years than to the present low prices." In the recent case of Los Angeles G. & E. Corp. v. R. R. Comm., 289 U. S. 287, Mr. Chief Justice HUGHES said: "As the property remains in the ownership of the complainant, the question is whether the complainant has been deprived of a fair return for the service rendered to the public in the use of the property. This court has repeatedly held that the basis of calculation is the fair value of the property, that is, that what the complainant is entitled to demand, in order that it may have 'just compensation,' is 'a fair return upon the reasonable value of the property at the time it is being used for the public.' In determining that basis, the criteria at hand for ascertaining market value, or what is called exchange value, are not commonly available. The property is not ordinarily the subject of barter and sale and, when rates themselves are in dispute, earnings produced by rates do not afford a standard for decision. The value of the property, or rate base, must be determined under these inescapable limitations. And mindful of its distinctive function in the enforcement of constitutional rights, the court has refused to be bound by any artificial rule or formula which changed conditions might upset. We have said that the judicial ascertainment of value for the purpose of deciding whether rates are confiscatory 'is not a matter of formulas, but there must be a reasonable judgment having its basis in a proper consideration of all relevant facts.' " It is our independent judgment that the commission properly considered the trend of prices up to the date of the filing of the report and arrived at a fair and reasonable figure in fixing the ultimate fair value of the physical property.

With these general observations, we will now con-

sider the specific items that affect fair value and are in dispute. The complaints as to errors in items involved in the valuation of the physical property arise on the appeal of the complainants with the exception that the company complains of the failure of the commission to add to the present value of the mains and service lines the amount fixed by an ordinance of the borough for opening certain streets. We note in passing that depreciation would not affect the value of land exclusive of buildings and there is a slight discrepancy in that respect, but we have taken this into account in approving the total figures. The item is not large enough to affect the ultimate result and to require a restating of all the figures and calculations. Our figures coincide precisely with those of the commission on the disputed items, and we shall endeavor to show our reasons for such conclusions by a separate examination of such items.

Land Values: The real estate of the utility, exclusive of improvements, was valued as of July 1, 1929, by the company's engineer at $10,000 for the land held in fee simple and $560 for a right of way, and by complainants' engineer at $5,500 and $500 respectively as of March 16, 1931. The commission fixed the total value as of July 1, 1929, at $8,280. From this sum there was deducted approximately 5 per cent to compensate for the change in values between July 1, 1929, and the date the report was filed. The difference in the valuations is accounted for in part by the fact that the respective valuations of the parties were made at periods almost two years apart and in the face of a changing market. It is difficult for a court or jury to harmonize the estimates of experts as to the value of real estate. Our difficulties are here increased by the fact that the evidence of neither party was satisfactory, for each depended upon the testimony of an engineer who made himself competent to testify only

by virtue of investigations and inquiry from others. There was not any opportunity to cross-examine those upon whom the engineers depended for their information. The testimony of the engineer for the complainants was, however, more convincing and we have given it greater weight than that of the company's expert. Our independent judgment with respect to this item coincides with that of the commission.

Oil Storage Tanks: The respondent had four storage tanks, three of steel and one of masonry. The complainants contend that the valuations placed upon the steel structures and foundations are too high and that the masonry tank is not "used and useful" in the business of the utility. As the commission accepted the valuation fixed by the complainants' engineer based on quoted prices for the value of the steel tanks, the only real dispute is as to whether the masonry tank should have been included. The complainants claim that this item should not be included in the inventory of the property for the reason that it was not "used and useful" as it was not used when the investigations were made, and the company had a contract with the Gulf Oil Corporation by which it supplied the needs of the company on demand, and the other tanks would, under such circumstances, provide ample storage facilities. The competent evidence shows that the masonry tank was being used at the time of the hearing for storage of oil in considerable quantities and had been so used continuously for some time. The evidence of the engineer for the company on this subject was corroborated and sustained by testimony of others and by facts and figures showing precisely the amount of oil stored while that of the complainants' engineer had very little support. We cannot exclude an item as not used and useful merely because the use of the instrument might be dispensed with for the time being. See Los Angeles G. & E.

Corp. v. R. R. Comm., supra. It is our duty to give consideration to the apparent good faith of the officers of the company in their determination that there was a reasonable requirement for its use. We are unable to discover any evidence that would warrant us in excluding this masonry tank, and there is not any evidence sufficient to overcome the facts and figures furnished by the company to sustain its valuation.

Relief Holder: This item consisted of a gas holder of fifty thousand cubic feet capacity. Estimates were made by the engineers for the respective parties and varied in the sum of $4,450. The company included in its estimate the cost of reinforced concrete foundation, but the evidence demonstrates that the foundation was not reinforced. The commission, therefore, properly deducted from the company's estimate, on this account, the sum of $1,174. While the engineers did not analyze their respective results so that all of the items which were considered might be taken into account and compared, it is apparent that the estimate of the engineer for the company included the cost of removing the holder from the railroad and placing it in position, and that no allowance was made on that account by the complainants. The exhibits and evidence show conclusively the necessity for such expense. We, therefore, have accepted the estimate of the company's engineer less a sufficient sum to adjust for foundation costs by reason of the absence of reinforcing, and this sustains the finding of the commission.

Storage Holder: The situation here is the same as in the case of the relief holder. We have adopted the estimate of the respondent of $36,592, reduced by $1,541 to correct the cost of reinforcement, leaving a net valuation of $35,051, as of July 1, 1929.

Distribution System and Service Lines: The complainants except to an allowance for lead joints used

in connecting the pipes forming the mains, and the company objects to the failure of the commission in fixing the value of the mains and connections to take into account the fees prescribed by a borough ordinance for digging up the streets in laying mains and service lines. The complainants made excavations for the purpose of ascertaining the condition of the mains and, as a result of such investigations, produced testimony to the effect that at least three-fourths of the joints were of cement, a cheaper construction than lead, while the claim of the respondent was based on the assumption that the joints were all of lead. The commission accepted the evidence of the complainants that three-fourths of the joints were of cement and assumed that the balance were of lead. It is argued that because no positive testimony was offered by the company as to what the proportions were between cement and lead, nothing should be allowed for lead joints, and this in the face of the fact that the examinations made by the respondent indicated a proportion of three-fourths and one-fourth. The commission also took notice, in arriving at its conclusion, of the historical fact developed by the testimony that cement joints were not in common use until 1913. In view of this testimony and these facts, we find no merit in the assignment of error of the complainants covering this item.

At the last hearing before the commission, prior to the first appeal, after the respondent had closed its testimony and complainants had about completed their evidence, the respondent made an offer to prove certain ordinances of the Borough of Chambersburg which made a charge of five cents per foot for laying mains and fifty cents for each opening for service pipes, for the purpose "of rebutting the testimony of Mr. Phillips, an engineer of the Borough of Chambersburg, who did not include such fees or charges in his

unit cost of the distribution system and services.'' The offer was overruled ''for the reason that it should have been presented and could have been presented as evidence in the case of the respondent and further that it is not rebuttal.'' The evidence was clearly such as should have been offered in chief. In addition, the respondent did not attempt to prove or offer to prove that it had actually paid such charges, although it did ask one of the witnesses with relation to a single item which it claimed to have paid to the borough under such an ordinance. No exception was taken to the rejection of this later offer. As we understood the parties at the oral argument, it was admitted that such fees were only paid on the items included under the head of ''Additions and Betterments after July 1, 1929,'' and a reference to the testimony shows that this item was very small. We said in Beaver Valley Water Co. v. P. S. C., 76 Pa. Superior Ct. 255, 264: ''It is true that if these lines were to be laid today the pavements would have to be taken up and streets repaved at a cost approximating $31,574.50, but as no part of such cost was incurred or paid by the company, and the pavements do not belong to it, the item would have to be rejected in fixing the present value of appellant's property for rate-making purposes, for the company admittedly made no such expenditure on its physical plant and should not be entitled to a fictitious credit therefor. We uphold the action of the commission in disallowing the claim for paving where the mains were laid before the pavements.'' This case and the instant case are similar. Here, almost all of the mains and service lines were laid before the ordinance was enacted or streets paved. Consequently, they were laid without expense to the company on that account. While in a proceeding before the commission, it is not necessary to rigorously enforce rules as to order of proof, there must be some limits placed.

We are of the opinion that the commission did not abuse its discretion in refusing to receive this evidence. In any event, it was not sufficient to affect the ultimate result.

Meters in Service: The number of meters in service was agreed upon, but respondent claimed an average cost of $13.98 a meter while the complainant allowed only $13.09 each. Here, as in the other testimony to which we have so far referred, the estimates were those of the two engineers representing the parties. The weight of the evidence is decidedly with that of the witness for the company. The complainants estimated the labor cost on the basis of an employee at fifty cents per hour, setting twelve meters per day, working ten hours a day. They also based their cost for the instruments upon unit costs "covering purchases in large quantities under syndicate contract from one particular person." A careful analysis of this testimony convinces us that there is not any merit in the objection of the complainants to this item, and our independent judgment is the same as that of the commission, that the fair value of the meters in service on July 1, 1929, was $38,433.

This brings us to a consideration of the disputed items involved in the intangible property proper for consideration in determining the rate base, and involves going concern value and cost of financing. For going concern value the company claimed $90,000 and the complainants conceded $33,333.99, but the commission allowed nothing. This presents an important question of vital interest to those concerned. The commission refused the allowance not because going concern value is not a matter proper for consideration, but on account of the alleged failure of the company to prove that such element was here present and the absence of any evidence from which the commission could evaluate such property right if it did exist. In

view of the concession of the complainants, it is necessary for us to examine this subject at some length.

That going concern value is a proper element for consideration in fixing a rate base is well expressed by our Brother Judge KELLER in the case of Beaver Valley W. Co. v. P. S. C., supra, as follows (p. 269): "The going concern value represents the difference in value between the bare physical plant of the company ready to do business and an equal plant with an income established from customers who are not under compulsion to utilize the service of the company, the business of which has been acquired gradually, and if reproduced would again be acquired gradually with an inevitable lag in getting customers. It is difficult to determine and cannot be ascertained with absolutely exact accuracy, but that is no reason why a fair allowance should not be made therefor: People ex rel. Kings County Lighting Co. v. Willcox, supra. 'That there is an element of value in an assembled and established plant, doing business and earning money over one not thus advanced, is self evident. This element of value is a property right, and should be considered in determining the value of the property upon which the owner has a right to make a fair return when the same is privately owned, although dedicated to public use': Des Moines Gas Co. v. Des Moines, 238 U. S. 153, p. 165. 'That there is a difference between even the cost of duplication, less depreciation, of the elements making up the water company plant and the commercial value of the business as a going concern, is evident': Omaha v. Omaha Water Co., 218 U. S. 180. It does not depend entirely on the deficits of operation for if so, a company that never acquired sufficient customers to be a paying concern and was therefore financially a failure would have the greatest going concern value. 'The greater the loss, the greater would be the value of the plant': Hanover Boro. v. Hanover

Sewer Co., 251 Pa. 95, p. 100. Such deficits, in so far as they are temporary and due to the lag in getting customers, are to be considered in connection with other matters; the profits earned from operation and paid as dividends, or put back into the plant; the character of the management; the growth of the earnings of the plant from year to year; the increased public benefits derived from the consolidations effected in return for the expenses in connection therewith; the length of time that necessarily ensued before the operation became financially successful, and any special circumstances in the particular case: Denver v. Denver Union Water Co., 246 U. S. 178, p. 192.'' The going concern value with which we are concerned has to do with that term in a limited sense as used in rate cases and not as it might be used in an ordinary mercantile or manufacturing business. ''The concept of going value is not to be used to escape the just exercise of the regulatory power in fixing rates, and, on the other hand, that authority is not entitled to treat a living organism as nothing more than bare bones'': Los Angeles G. & E. Corp. v. R. R. Comm., supra.

Allowance is made for such item not because it represents a past loss, but because it is a proper developmental cost which represents an investment, gives vitality to the plant, and from which the public receives a benefit. In the case of Georgia Ry. v. R. R. Comm., 262 U. S. 625, 632, the United States Supreme Court recognized this distinction when it said: ''That past losses are not to be capitalized as property on which the fair return is based was held in Knoxville v. Knoxville Water Co., 212 U. S. 1, 14; Galveston Electric Co. v. Galveston, 258 U. S. 388. Here, this conclusion seems even clearer than it was in those cases. The losses under consideration in the case at bar were obviously *not a part of development cost*. They were due to insufficiency of previous rates.'' (Italics ours.)

We have endeavored in our previous cases to indicate what the term comprehends and the proofs necessary in determining the amount to be allowed. In Scranton-Spring Brook Water Co. v. P. S. C., 105 Pa. Superior Ct. 203, 220, 160 A. 230, we said: "Unlike the other intangibles allowed, it is not wholly a theoretical matter, but must be supported, when allowed, by evidence of an actual lag in the early years of business, which should be allowed for in arriving at the rate base. When that evidence is furnished, calculations are then in order to determine as nearly as possible the present allowance for such developmental cost." In the case of City of York v. P. S. C., 85 Pa. Superior Ct. 139, 142, we said: "Some corporations have years of tedious waiting until they get on a paying basis; others have an immediate public demand and a profitable return as soon as started. Some fact must disclose to which class the particular corporation under consideration belongs. Before we figure going concern value, we should have such evidence that there was a lag before the business became established." And in Beaver Valley W. Co. v. P. S. C., supra, we said (p. 270): "Such deficits, in so far as they are temporary and due to the lag in getting customers, are to be considered in connection with other matters." On this same subject the United States Supreme Court said: "Whether going concern value should be considered and allowed at all in determining the base for rate making, and if allowed what the amount of it should be, depends upon the financial history of the Company (Galveston Electric Co. v. Galveston, 258 U. S. 388), and it is impossible for us to determine whether the requisite history for deciding this question is to be found in the three large volumes of the transcript of the record of the case, containing 1664 pages, without reading the whole of it": Houston v.

Southwestern Tel. Co., 259 U. S. 318, 325. Going concern value is allowed not because it represents a deficit in earnings, but because it is a part of the development cost, and this court has committed itself to the proposition that it is not allowable unless it has resulted in a lag. It follows that the burden is here on the utility to show that there has been a lag and the amount that should be allowed for going concern value. The commission held that the burden had not been met in either respect.

The respondent company, while questioning the correctness of our rulings with respect to lag, offered evidence which it maintains will support an allowance under our cases. This evidence consisted of (a) a history of the development of the plant and community and changes in purposes for which gas was used by consumers; (b) data showing a lag in the use of a number of extensions and other improvements made by the company; (c) the opinions of experts; and (d) admissions by experts called by the complaining municipalities. We will refer to the evidence under these heads.

(a) The Chambersburg Gas Company began to supply manufactured gas to consumers in the borough of Chambersburg in 1856. In 1864 Chambersburg was destroyed by fire and all previous records of the company were lost. Other records of the company prior to 1901 were not preserved, but from that time they are intact. In the early history of the company, gas was supplied for lighting purposes in buildings and on the streets only and the gas was consumed in the form of an open flame until the adoption of the incandescent mantle. Beginning about 1890, the business of the company was affected by reason of competition with electric lighting. The company then promoted the use of gas first for cooking and hot water boilers and later for house heating. In the end this resulted in a prof-

itable business of supplying gas almost exclusively as a source of heat rather than light. Originally the company manufactured coal gas, but about 1882 it rebuilt the manufacturing plant and installed a process for making water gas.

(b) The company from its books furnished evidence as to the cost of forty-six different extensions of its mains involving 40,337 feet of pipe installed since 1901, or about one-third of its system, and then from its books showed the income received from such extensions and the time that expired before the lines produced a fair return. Evidently the commission was of the opinion that in the extension of these lines there was a lag, but it held that the "company's revenues as a whole were ample to absorb any lag on extensions which may have occurred and yielded a fair net return on the whole property." With this conclusion, insofar as it concerned those particular extensions, we agree, but there is still some probative value in the fact that so large a part of the business only became profitable after a period of inadequate return. These facts are also entitled to be considered in connection with the history of the business and particularly the change from lighting to heating prior to 1901 and from which we may infer the personnel work that would naturally be done in order to persuade its customers to use gas for cooking, hot water boilers, and finally house heating. This presents a different situation from that found in the Scranton-Spring Brook Water Company case where the evidence was to the effect that the water companies were successful from the start "with no lag in business." It is true we said in that case (p. 221): "In the absence of any evidence as to an actual or historical lag in the building up of business, the calculations of the company's engineers, based wholly on a theoretical lag, are insufficient to support an allowance for 'going concern

value.' " Here the inferences are to the contrary. In Los Angeles Gas Co. v. R. R. Comm., 289 U. S. 287, 313, the United States Supreme Court clearly indicated its intention to follow the principles laid down in Des Moines Gas Co. v. Des Moines, 238 U. S. 153, 165, and said: "This court has declared it to be *self-evident* 'that there is an element of value in an assembled and established plant, doing business and earning money, over one not thus advanced,' and that this element of value is 'a property right' which should be considered 'in determining the value of the property upon which the owner has a right to make a fair return.' " (Italics supplied.)

There was also evidence tending to show that the company had been managed with more than ordinary skill. This would furnish a ground for an inference that the company had acquired a working force of competent employees which is also an element to be considered for it helped to make the plant something more than "bare bones." We cannot escape the conviction that there was necessarily some lag in the acquisition of the profitable business now enjoyed by the utility and an intangible value beyond the mere value of the physical plant.

(c) There are two additional items that lend weight to the claim of the utility. The experts called by the company and by the complainants who all testified to the existence of a going concern value did not base their evidence as to the existence of such value wholly on a theoretical lag referred to in the Scranton-Spring Brook Water Company case. The company's experts showed a large experience in dealing with gas companies of the same character as the one here involved, acquired by scientific training and practical experience in the management of such plants. They also testified to facts showing careful study of the history of this particular plant and community. The situation

here is not similar to that disclosed in the Los Angeles case, Houston v. Southwestern Tel. Co., 259 U. S. 318, 325; Columbus G. & F. Co. v. P. U. C., 302 U. S. 398, where the testimony of the experts left a definite impression that their "opinions are [were] derived for the most part from a professed experience and understanding of business conditions generally, and very little from any knowledge of the 'history and circumstances of the particular enterprise.'" We do not regard such evidence as was produced in this case as indicating "wholly a theoretical lag," and we do not believe that such evidence can be ignored any more than we would be justified in disregarding the expert opinion of a physician as to the condition of a subject whom he had examined. This is not the fixing of a theoretical value based on the mere hypothesis that a lag always exists and may be fixed by experts by formula. It is a matter of common experience and of everyday practice for the managers of business to call in experts who are able to advise them as to whether a given course will be profitable. The experts in effect expressed the opinion that in the light of the history and circumstances of the community served and the particular enterprise developed, there was necessarily a period prior to 1901 when the residents of Chambersburg did not adopt the use of a commodity which had merit and there were on that account periods of inadequate return. Such expert testimony was recognized as having probative value in McCardle v. Indianapolis Co., 272 U. S. 417, and in the Los Angeles case.

(d) There remains a powerful argument for the company, to wit, that the engineer called by the respondent, who had fully qualified, admitted a going concern value of $33,334. This opinion likewise was the result of a study of the history of the particular company and the community in which it was situated.

We are convinced that there necessarily was some

lag in the acquisition of the business of this company and that there was sufficient evidence to warrant the conclusion that there is present here a value which is more than the reproduction value of the physical plant. We believe the commission committed its only error of any consequence in this case in assuming that lag or going concern value could only be shown from the books of the company. We have never so stated the law and such position could not be sustained, particularly when the books by which such facts might be shown have been destroyed.

We recognize the difficulties presented in fixing the amount of such value. "Each case must be controlled by its own circumstances": Denver v. Denver Union Water Co., 246 U. S. 178. "It does not give license to mere speculation; it calls for consideration of the history and circumstances of the particular enterprise, and attempts at precise definition have been avoided": Los Angeles Gas Co. v. R. R. Comm., supra, p. 314. No rule can be set, nor can a formula be invented which will enable the amount to be fixed by a definite scale, although the courts have recognized certain well defined limits.

Allowance has been made for this intangible value under varying categories. Cost of financing frequently embraces a return for the use of capital during the period of construction when there is necessarily a lag, and allowances are made under the heads of "overhead" and "organization expenses." These frequently impinge upon schedules covering going concern value. It is not every loss in the development of a business that is to be included and frequently a liberal allowance is made for extensions under the head of an allowance for expense of operation.

We are of the opinion that the estimates of the experts for the utility and the complainants made allowance for items that either were included under other

heads or should not have been allowed, but we "are not entitled to treat a living organism as nothing more than bare bones." (Los Angeles Gas Co. v. R. R. Comm., supra.) Our independent judgment is that an allowance of $15,000 should have been made for going concern value, and when this amount and amounts allowed for the other intangibles are added we have the fair value of the "assembled and established plant, doing business and earning money." In this connection we call attention to the recent decisions of the United States Supreme Court in the Los Angeles case, Dayton Power & Light Co. v. P. U. C., 292 U. S. 290, and Columbus G. & F. Co. v. P. U. C., 292 U. S. 398, which clearly indicate that the intangible value allowed above bare physical value is frequently comprehended under other allowances, and such fact may be properly taken into account. Had it not appeared that all records prior to 1901 as to earnings of this company had been destroyed, we might have been justified in charging the failure to furnish a financial history to the utility and held that it had not met the burden resting on it.

If the allowance made seems small, it is due to the failure of the company to furnish more accurate data as to the previous earnings of the company and a history of the development of the present going plant sufficient to warrant a larger allowance. It may have furnished all it could, but the burden was on the utility.

As an additional element in intangibles forming a part of the rate base, the company sought to have an allowance for the cost of financing and asked five per cent of the cost of the plant. The complainants conceded two per cent. The commission on this subject said: "The Commission believes that 3% of this total or $13,561 is sufficient to meet the reasonable cost of raising the necessary funds under the conditions shown to exist in this case." As to the propriety of

considering this as an element in fair value there can be no doubt. In the case of Ben Avon Boro. v. Ohio Valley W. Co., 271 Pa. 346, 356, 114 A. 369, Mr. Justice SIMPSON said: "The commission says that sufficient evidence of actual payment thereof [brokerage on sale of bonds of the water company] was not produced, but everybody knows that expenses are necessarily incurred in such sales; even our Victory and Liberty Loans could not be marketed except at a very heavy cost. There is no legal principle standing in the way of making a proper allowance therefor, and it is difficult to understand the basis of the mistake of those who hold it should not be allowed ...... In order to render innocuous the error made in our prior opinion, that 'brokerage for the sale of its bonds ...... should properly be considered in connection with the interest charge, and should not be included in the fixed capitalization of the company as the basis of a permanent charge,' we now overrule it. As stated, brokerage is a principal expense, just as it would have been had the labor and materials been paid for in bonds at their market value, as in effect was done." In City of Erie v. P. S. C., 96 Pa. Superior Ct. 42, just as here, the parties depended upon proof of reproduction cost and not historic cost to fix fair value, and it was contended that the testimony was not sufficient to warrant the allowance of cost of financing. We there said (p. 51): "When evidence of original cost is introduced as a factor in determining present fair value it is obviously quite proper to consider the actual experience of the company in the matter of the cost of obtaining money and in such cases it has been consistently held that mere theoretical or hypothetical costs of this nature are not to be included. Cost of financing is however an element of value to be considered in a reproduction cost estimate. It is a definite item of cost and by the introduction of the testimony of witnesses familiar

with the cost of issuing and marketing securities it should be possible to determine it with substantial accuracy." Our own independent judgment is that the amount allowed by the commission, to wit, three per cent of the cost of the property including overhead construction costs, was a proper amount.

Adding $15,000 to the sum fixed by the commission, we find the fair value of the "assembled and established plant doing business and earning money" to be $395,000.

The next questions raised by the appeals concern that portion of the order of the commission which fixed the gross annual revenue which the company is entitled to receive. The commission summarized its conclusions as follows:

| | |
|---|---|
| 7% return on the value of $380,000 .. | $26,600 |
| Adjusted operating expenses ...... | 51,514 |
| Annual reserve for renewals and replacements ..................... | 7,500 |
| Maximum Permissible Gross Revenue ................. | $85,614 |

The company now claims that $10,000 should have been allowed as an annual reserve for renewals and replacements, and the complainants ask that the amount be reduced to $7,092. Each has made this part of the order the subject of an assignment of error in its appeal. As the entire argument of the complainants on this subject is based upon the assumption that the fair value of the property was $360,000, and we have already determined the fair value to be $395,000, there is no merit in such assignment of error. The company gives as reasons for an increased allowance the facts that $10,000 has been set up by it on the books of the company beginning in 1929 as a reserve for depreciation and that the commission failed to take into account the factor of obsolescence. We find no

merit in either contention. The sum set up on the
books for renewals and replacements was first made
after the beginning of this controversy and amounts
to nothing more than a claim by the company for such
an allowance. If the company has not now a proper
reserve, the responsibility is upon it. As to obsoles-
cence, the fact is that the report of the commission
shows clearly that this item was taken into account.
There is a close relationship between the amount of
depreciation that occurred prior to the date the report
was filed and what it would be in the future. In ar-
riving at fair value, accrued depreciation was cal-
culated on a low basis on the strength of the testimony
of the engineers as to the actual condition of the
property. This must necessarily throw some light on
the rate at which the property is deteriorating by nat-
ural wear and tear. At the same time, the company
is entitled to include in the item a sum adequate to
offset obsolescence. We take judicial notice of the fact
that rapid changes have been made in manufacturing
processes of all kinds and that it is frequently neces-
sary to junk machinery and equipment and replace
such articles with more efficient equipment. The legal
arguments of counsel for both parties have been able
and have been helpful to the court. In the discussion
of facts necessary to be considered in forming the
independent judgment which is required of this court
under the Amendment of 1931, we have not had the
precise testimony or analysis of that testimony to
which this court is entitled, and for that reason it is
difficult for the court to form an accurate judgment
on some of the items of which the one now under con-
sideration is an example. We have neither the tech-
nical training and experience, nor the assistance of a
staff which will enable us to check results and must
necessarily depend upon expert advice in the form of
testimony and on the analysis of such testimony by

counsel familiar with the matter, in order that we may properly perform the duties imposed upon us. On this subject we have several times re-read the testimony for the purpose of performing our duties, and as a result have arrived at the conclusion that the sum of $7,500 allowed by the commission was fair and reasonable.

We approve the seven per cent return allowed by the commission.

The company has assigned as error the failure of the commission to make any allowance for federal income tax in computing the allowable gross revenue. It claimed to be entitled to receive an allowance equal to 13¾ per cent of the net annual return computed to be $26,600. The commission refused the claim on the ground that the company paid no such tax. The testimony in support of the claim of the company for an allowance on this account was meager, so that after the testimony was closed the commission opened the case and gave to the company an opportunity to furnish any evidence that it might wish in support of such claim.

In fixing rates and setting up a tariff prescribing the rates which the company should receive, it is required that allowance be made for income tax paid: Galveston Electric Co. v. Galveston, 258 U. S. 388; Georgia Ry. v. R. R. Comm., supra; Bangor Water Co. v. P. S. C., 82 Pa. Superior Ct. 48; City of York v. P. S. C., supra.

For the period prior to January 1, 1934, affiliated corporations were permitted to make a consolidated return and federal income tax was computed upon the net taxable income of the combined companies. The respondent company is one of several hundred affiliated companies owned and controlled by the Central Public Utility Company (formerly Central Public Service Company), and for a number of years it made

a consolidated return. Beginning with the year 1926 and including 1931, no federal income tax was paid by either the parent company or the respondent company. The record necessarily does not disclose whether such taxes were paid for the year 1932 and subsequent years. However, by the federal revenue act of 1934, these companies are not permitted to make a consolidated return. It is therefore clear that beginning with January 1, 1934, the respondent company will be obliged to pay a federal income tax at the rate of 13¾ per cent of its taxable income.

The commission in 1932 very properly held that the utility was not entitled to an allowance on account of a tax which it had not been called upon to pay and which there was then no evidence that it would be required to pay. The situation, however, has changed and as the rates affect the period beginning with January 1, 1934, an allowance should be made on that account. As it is necessary to send the report back to the commission for the purpose of revising the tariff, we deem it proper to have the commission fix the additional amount to be allowed for federal income tax and so determine the revenues which the utility is entitled to receive. The present situation arises from a change in the law and affects a period beginning on January 1, 1934, and should therefore be taken into account in fixing a fair return. While the net income used as a basis for computing federal income tax of corporations is not necessarily the same as the net income fixed as a fair return, there should be no serious difficulty in making the necessary adjustments and so estimating a proper allowance for such tax.

The commission, in computing the gross annual return, also allowed the company an estimated loss of $600 per year for bad accounts. The company claims that this should be increased at least to $1,000. We are of the opinion that the commission made too low

an allowance in this respect. The average loss for the three years, 1927 to 1929, inclusive, was $496. In 1930, the losses were $886.29 and in the first half of 1931, $917.52. If we assume the losses for the second half of 1931 were the same as for the first half, the average for the five-year period was approximately $840. We believe that under the circumstances an allowance should be made for the trend. The evidence offered us is quite meager, but our own independent judgment is that there should be an allowance on this account of $900 per year.

In estimating the probable expenses of the company, there remains for consideration one additional item. The commission made an allowance of $2,500 per year "as general administrative office expense." The company has not excepted to this allowance, but the borough has made it a subject of one of its assignments of error and claims that no allowance whatever should be made. At the time the testimony was taken, the capital stock of the Chambersburg Gas Company was owned by Southern Gas Securities Company; that company, in turn, by Consolidated Electric and Gas Company; and that company by Central Public Utility Company. The Central Public Utility Company operated several hundred utility companies under separate corporate titles and also a corporation known as Federated Utilities Corporation, a management corporation. A contract was entered into between the respondent and Federated Utilities whereby the management corporation furnished to the respondent executive direction, engineering advice, purchasing, auditing, insurance, rate advice, and legal advice in return for which respondent paid Federated Utilities three per cent of the gross revenue of the respondent company and ten per cent on account of any construction work for engineering services. This management fee for the years 1928 to 1930 averaged about

$3,000 per year. The respondent company failed to furnish any evidence of the cost of this service to the management company. It did, however, offer evidence to show the service which was rendered, the necessity for it, and the value thereof, and that it would have cost the company $7,750 per year to have procured the same service, had it acted independently. It also appeared that no fees were paid to directors or officers by the respondent. The commission declined to accept the average price paid to the management corporation as conclusive of the amount which should be allowed and made the allowance rather as a reasonable expense of administration than on account of the contract. The borough, in support of its position, urges that because the charge arises out of intercorporate relations, no allowance can be made without proof of the exact cost of the service to the companies affiliated considered as a unit. There is no doubt that in the consideration of charges arising out of intercompany relationships between affiliated companies, such charges should be scrutinized with care: Johnsonburg v. P. S. C., 98 Pa. Superior Ct. 284, 291. In the case of Houston v. Southwestern Tel. Co., 259 U. S. 318, 323, it was said: "Under the circumstances disclosed in the evidence, the fact that the American Telephone & Telegraph Company controlled the company and the Western Electric Company by stock ownership is not important beyond requiring close scrutiny of their dealings to prevent imposition upon the community served by the company, but the court recognized and applied this rule." The borough cites the case of Smith v. Illinois Bell Tel. Co., 282 U. S. 135. It there appeared that two companies for practical purposes were under a common ownership, and that one company was renting from the other equipment necessary in the performance of its duties as a public utility and agreeing to pay therefor a fixed rental. The rental

claimed was reduced by the lower court. The Illinois company appealed on the ground that the rent fixed was confiscatory and complained of the failure of the commission to allow the full amount fixed by the contract. The Supreme Court held that in a confiscation proceeding the court in its judicial capacity could not set aside an order of the legislative commission for failure to allow such fees unless the cost of the service to the company rendering it was presented in evidence. The Supreme Court did not even infer in that opinion, as complainant seems to assume, that the legislative commission may not allow something for the services which the contract covered. On the contrary, in that very case a smaller amount was allowed by the lower court. It is also well settled that neither the commission nor this court is the financial manager of the corporation; that the judgment of the board of directors of the corporation is entitled to consideration, and we cannot ignore items charged by a utility as operating expenses unless there is an abuse of discretion in that regard by the corporate officers: Springfield v. Springfield Gas & Elec. Corp., 291 Ill. 209, 234; Houston v. Southwestern Tel. Co., supra. It is most apparent that the commission carefully scrutinized the contract and then, taking into consideration the judgment of the corporate officers, the service rendered, the value and necessity thereof, allowed an amount which they deemed fair and reasonable. It was for the commission to determine what the reasonable expense would be of operating this company. After a careful consideration of the record and the evidence, we are persuaded that the amount allowed is fair and reasonable.

The net result of the changes made by us is to increase the fair value of the property as of the date fixed by the commission to $395,000, to increase the allowance for uncollectible accounts by $300, and to

add a sum on account of liability for federal income tax to be fixed by the commission. Otherwise the order of the commission is approved. On this account, it will be necessary to make some increase in the tariff prescribed by the commission. We believe we should express our views on that tariff in order that we may reduce delay to a minimum. If it were not for the increases which we have allowed, we would have approved the tariff as fixed by the commission, and we will give our reasons for that conclusion.

The report of the commission was filed on November 15, 1932. A short time later the company filed with the commission a petition for a re-hearing, alleging that the tariff which it had been ordered to file would not yield the revenue which the commission had held that it was entitled to receive; that the gross revenue for the first ten months of 1932 had been materially reduced and if the schedule established by the order was applied to the billings for that same period, the receipts would be much less than a reasonable return. The commission promptly refused the petition and the company assigned as errors the tariff schedule prescribed and the refusal of the petition for re-hearing. That the company is presently entitled to a reasonable return is not open to argument. In support of its position the company first suggests that there is no basis in the record for the prescribed tariff. An examination of the facts proved will not sustain this contention. As the commission has shown in its brief filed with us, we can find a very substantial basis for its order. The complainants offered in evidence a schedule (Complainants' Exhibit No. 3) showing a summary of all bills rendered for gas during the year April, 1929, to March, 1930, inclusive, and giving the number of bills for the different quantities of gas consumed each month. When we apply the new rates to these bills, we find that the yield would have been $86,092

for one year, or approximately $200 more than the commission found that the company is entitled to receive. The company replies in its petition for a re-hearing that if the new rates are tested by its billings for the first ten months of 1932, there will be a heavy shrinkage of revenue, and on this assertion stakes its argument. Such position is not tenable for a number of reasons, as we shall show.

The company has not had any opportunity to test the effect of a reduction of rates on the amount of gas consumed, but assumed that the consumption would not be increased. As was said by the United States Supreme Court in Willcox v. Consolidated Gas Co., 212 U. S. 19, 51: "It is equally true that a reduction in rates will not always reduce the net earnings, but on the contrary may increase them. The question of how much an increased consumption under a less rate will increase the earnings of complainant, if at all, at a cost not proportioned to the former cost, can be answered only by a practical test." In May, 1929, this company made an average reduction in rates, and coincident with that reduction there was not only a marked, but continual, increase in the number of feet of gas consumed and revenue received, which carried on to the end of 1931 (Respondent's Exhibit No. 10). There was at the same time, however, a reduction in the number of small consumers whose rate was increased. The last tariff has made a further reduction and, judging by the past, there should be a corresponding increase in number of consumers and amount of gas consumed. It is further urged that the alleged drop in consumption was due to changed conditions in the community, due to the depression. We call attention, however, to the fact that the increases to which we have referred began in 1929 and progressed through 1931. It is fair to assume that the unprecedented conditions which have been existing for the

past few years will have an adverse effect on this utility the same as on all other lines of business. Experience, however, does not lead us to believe that such falling off in business can be entirely offset by increase in charges. The character of the depression through which we have been passing is without precedent, and we have had abundant opportunity to observe the difficulty of attempting to predict the future, but we must still depend for wise prognosis on the experience we have gained in the past. Viewing the evidence and the assertions in the petition for a rehearing in a light most favorable to the company, they did not furnish a sufficient basis to warrant the commission in increasing the rates. Rates are not ordinarily fixed on the assumption that they will be in effect for one month or a few months, but at least for a reasonable time under the circumstances. It is within the realm of possibility that these rates when tested by actual experience may not prove adequate. On the other hand, it is by no means certain just what effect an increase in rates will have on the revenue received. Certainly rates may be increased to a point of diminishing returns. If we were to give the effect to the depression which the company insists upon, it would be necessary for the same reason to revise the rate base. Taking into account all the testimony and the values and allowances fixed by the commission, we are convinced that the schedule was as nearly fair and adequate as could then have been devised.

While we approve the general plan of the commission as applied to the premises on which it acted, it is necessary to make some increase in the tariff on account of the changes we have made in the rate base and allowances.

The order of the public service commission is reversed and the record is remitted to the commission for further action not inconsistent with this opinion.