Lehighton Water Supply Co., Appellant, v. Public Service Commission of Pennsylvania et al.

Argued May 7, 1930.

Before Trexler, P. J., Keller, Linn, Gawthrop, Cunningham and Baldrige, JJ.

*W. Y. Blanning,* for appellant, cited: Ben Avon Borough v. P. S. C., 271 Pa. 346; Southwestern Bell Tel. Co. v. P. S. C., 262 U. S. 276; McCardle v. Indianapolis Water Co., 272 U. S. 400.

*John Fox Weiss,* Counsel for the Public Service Commission, and with him *E. Everett Mather, Jr.,* Assistant Counsel, and *Daniel H. Kunkel,* for appellee, cited: Erie City v. P. S. C., 278 Pa. 512; Minnesota Rate Case, 230 U. S. 352, 450-455; Erie v. P. S. C., 96 Pa. Superior Ct. 42; Beaver Valley Water Co. v. P. S. C., 76 Pa. Superior Ct. 255; Newport Home Water Co. v. P. S. C., 76 Pa. Superior Ct. 386.

OPINION BY BALDRIGE, J., July 10, 1930:

This is an appeal from an order of the Public Service Commission directing the appellant to file a new tariff reducing its charges.

The records of two earlier cases involving the same matter were introduced in evidence so that the facts in this case are obtained through the combined history of the three proceedings.

On May 31, 1928, the Lehighton Water Supply Company filed with the commission a new tariff increasing its rates for water service. Complaints were filed with the commission before the effective date of the new rates, alleging that they were unreasonable, thus imposing the burden on the appellant of justifying the increased rates: Public Service Company Law of July 26, 1913, P. L. 1374, Article V, section 14. The commission sustained the complaints and this appeal was thereupon taken.

The question to be determined is, whether the order of the commission is fair and reasonable, or confiscatory.

"What the company is entitled to ask is a fair return upon the value of that which it employs for public convenience": Smyth v. Ames, 169 U. S. 466 (547), and the public is entitled to be served at reasonable rates on that value. The Public Service Commission considered the original cost of construction and reproduction costs, and other factors, but for the purpose only of determining the present fair value of appellant's property, and that is the correct standard upon which to find reasonable rates: San Diego Land & Town Co. v. National City, 174 U. S. 739 (757).

The appellant was incorporated on August 6, 1888, for the purpose of supplying water to the Borough of Lehighton. The Weissport Water Company was incorporated September 26, 1893, for the purpose of supplying water to the Borough of Weissport. These companies constructed plants and rendered service within their respective territories until 1899. The Lehighton Water Supply Company was incorporated November 8, 1899, secured the entire capital stock of the above named corporations, and leased their properties for the term of 999 years. The record of the original companies prior to the lease of their property had been lost. From the best evidence available, the commission in its report determined the original cost of construction to be $215,000, excluding the cost of service lines constructed at consumers' expense, and found the fair value of the respondent's property used and useful in the public service as $375,000.

When the Hall complaint, which was incorporated in this record, was heard on March 4, 1921, arrangements were made for an engineers' conference. It was agreed as a result thereof that the reproduction cost at average prices for the five-year period ending

December 31, 1919, was $432,918. Controlling interests in the appellant were sold thereafter and the company then introduced a new reproduction cost of $819,335.-53, as of February 15, 1929, prepared for the National Water Works Corporation, and known as the Carpenter estimate. The following reductions from the undepreciated prices were made by the commission:

"Service lines: reduced from $38,830.14 to $5,387.-02. Meters in stock: reduced from $1,202.88 to $302.-88. Cost of trenching for 7,000 feet of pipe: reduced $5,000. Cost of cast iron pipe: reduced $8,692.40. Cost of trenching and backfill: reduced $23,244. Land: reduced from $286,875 to $35,200. Rights of way and agreements: reduced from $1,575 to $800. Total cost of physical property: reduced from $693,080 to $369,-350. Accrued depreciation: increased by use of different basis. Overheads: reduced by using same percentages on a smaller valuation. Total cost new: reduced from $799,412.26 to $436,000. Total depreciated cost: reduced from $752,382.55 to $373,000. Going cost: estimate of $63,952.68 omitted and going concern value of $25,000 added."

No objection was made to the reduction in the service lines and meters.

The cost of trenching of the transmission line between Long Run Reservoir and Lehigh River, under the Carpenter estimate, was at the rate of 74 cents a foot for a 10-inch line and 69 cents a foot for an 8-inch line. This cost estimate did not take into consideration that these two lines of pipe were placed in the same trench, but was estimated on separate trenches as a trench was required for each line. The appellant contends that the reduction should not be more than $2,502.50. While there might be more expense in connection with the laying of two pipes in one trench, we do not think that the deduction made

by the commission is materially more than the testimoney warrants. At least, it is insufficient to affect the rate basis.

The commission in determining the average current price of pipe prevailing during the latter half of 1928 and 1929, fixed $4 per ton less than the appellant's estimate, which is based on the price of $37 per ton. According to the figures appearing of record, prices during summer construction periods run somewhat lower than those quoted during the winter. The average price for the last half of 1928 and during the construction period of 1929 under the figures submitted was $32.46 per ton. The evidence justifies the commission in holding that the appellant's appraisal was $4 a ton more than the pipe could have been purchased for during that period.

The cost of trenching and backfilling was ascertained by the engineer for appellant on the unit basis of 66 cents per cubic yard for each dollar paid per day in wages. It was conceded that in many cases the 40-cent unit used by the commission was sufficient for this cost. The higher unit was based upon the laying of several disconnected lines, aggregating 1,790 feet, in Lehighton, in 1922. It is a matter of practical knowledge that ordinarily the building of a continuous line of trench outside of a municipality could be constructed at less cost than several small jobs in a borough.

The chief complaint is to the reduction of the physical property from $693,080 to $369,350. This is the result largely of valuing the land used as water sheds, comprised of 1,605 acres, at $33,200, in place of $280,275 as appraised by an engineer for appellant, while the complainant's witness, Graver, placed the value at $26,527. These water shed lands consist of two tracts on Long Run and three tracts, mostly within the water shed area of Pine Run, and were acquired in 1890 and

1897. There is also one parcel on each of the two small streams between Pine Run and Long Run acquired about the same time as those on Long Run, but they have never been used and are not useful in the service and were not considered in the appraisement. The original cost of the real estate was $8,962.89. At the hearing of the Hall complaint, G. M. West, manager of the water company, submitted a cost estimate which showed that the value of the water shed lands, as of September 1, 1920, was $34,435. Later, the engineers' conference valued the land at prices of the year 1920 at $35,077.60.

R. H. Graver, a resident of Lehighton, engaged in the real estate and insurance business, was employed by the engineers of the appellant for the making of a report and appraisal of the real estate holdings of the Lehighton Water Supply Company and its rights of way, and submitted a statement of appraisal valuing the water shed land at $26,527.25. This value was considered too low and William S. Pugh, a civil and mining engineer, residing in Pottsville, about forty miles distant, was employed, and gave a description of the property as "wild land, heavily wooded, unpolluted." He was asked the following question: "Q. What in your opinion is a fair value of the land for water shed purposes? A. The 1604.9 I value at $175 an acre, or $280,875." The proper test in fixing present value of the lands is present market value, considering all its available uses and purposes which affect market value, and not a special value for water shed purposes: Erie City v. P. S. C., 278 Pa. 512. The commission held that Pugh did not apply the proper test of value, as recognized by the law for rate making purposes, and, therefore, based its conclusions upon the testimony of Graver and on the other evidence in the case.

In Simpson v. Shepard, 230 U.S. 352 (451), present

Chief Justice HUGHES, in discussing the proper standard of appraisal of utility lands for rate making purposes, said: "But, aside from this, it is impossible to assume, in making a judicial finding of what it would cost to acquire the property, that the company would be compelled to pay more than its fair market value. —It is urged that in this view, the company would be bound to pay the 'railway value' of the property. But, supposing the railroad to be obliterated and the lands to be held by others, the owner of each parcel would be entitled to receive on its condemnation, its fair market value for all its available uses and purposes."

Included in the real estate belonging to the appellant are forty town lots, approximately ten of which are used as the site of an equalizing reservoir. The forty lots were appraised by Pugh at $6,000 and by Graver at $2,000. The sum of $2,000 was allowed by the commission. Pugh's evidence clearly indicated that his knowledge of the value of property in the neighborhood where these lots are located was inadequate to give helpful information to the commission as he fixed his value upon inquiry made of a stranger whom he met casually and whose name he could not even recall. Taking into consideration the character of the land and all of the testimony, we find no reason to differ with the commission in its value of the real estate.

Nor do we find any merit in the objection to the slight reduction in the rights of way from $1,575 to $800.

The next complaint is the basis used to determine the accrued depreciation from the estimated reproduction cost new. Carpenter deducted accrued depreciation determined by the 4% sinking fund method. The engineering conference had deducted accrued depreciation determined by the straight line method. The commission used the 4% sinking fund method,

but, instead of taking the estimated service life of the different classes of property, it used a composite life of sixty years for depreciable property. This is an approved method but it is not the only one recognized. The objection of the appellant is that the composite age of sixty years for depreciable property is a shorter life span than the service life was estimated by Carpenter. But his testimony was not binding upon the commission as it was within their power, so long as they did not arbitrarily disregard it, to give it such weight only as they deemed it was entitled to receive. His deductions were based on an estimate made from a study of the company's records rather than an actual physical examination of the property, and, therefore, a certain amount of conjecture was necessarily involved. We cannot say that the deduction for accrued depreciation is too large.

The appellant calculated its allowance for intangibles and overheads by means of percentages of physical property, totalling $693,086. The commission found that the reproduction cost new of the respondent's property used and useful in the public service, exclusive of working capital and going concern value, is $436,000, and they deducted $63,000 as accrued depreciation by using the 4% sinking fund method and a composite life of sixty years for depreciable property, resulting in a value of $373,000. Taking into consideration this amount, the history and nature of the respondent's property, its water rights, and allowing $25,000 for going concern value and $3,000 for working capital, the fair value of the respondent's property was determined to be $375,000, and the commission allowed a return of 7% on that amount.

The appellant does not contend that the commission's finding of fair value for the items included therein is incorrect, if its estimate of the depreciated reproduction costs at 1929 prices of $344,000 is justi-

fied, but claims the commission unjustly deducted $63,000 from reproduction costs. We do not subscribe to this contention as we believe the commission's determination was warranted by the evidence.

The appellant complains further that included in the rate base is a sum of $25,000 for going concern value, which is insufficient, and that that sum should have been at least $60,000. In the fair value fixed in 1924, the allowance was $20,000. Going concern value is the development costs and it is so uncertain that it is difficult to define and fix in amount. Whether or not it is too low or too high depends upon the circumstances peculiar to each case. It was defined by Judge Keller in Beaver Valley Water Co. v. P. S. C., 76 Pa. Superior Ct. 255 (269) as "the difference in value between the bare physical plant of the company ready to do business and an equal plant with an income established from customers who are not under compulsion to utilize the service of the company, the business of which has been acquired gradually, and if reproduced would again be acquired gradually with an inevitable lag in getting customers." The appellant assumed that the lag in business and revenue before the company acquired its business, would amount to a sum equal approximately to 8% of the cost new of physical property. There are some properties that are successful from the very beginning and do not experience a lag in acquiring business, and the appellant seems to be in that fortunate class for from the early annual reports, the company was on a paying basis. In City of York v. P.S.C., 85 Pa. Superior Ct. 139 (142), Judge Trexler, said, "Before we figure going concern value, we should have such evidence that there was a lag before business became established." See also Newport Home Water Co. v. P. S. C., 76 Pa. Superior Ct. 386.

A careful consideration of the record and the briefs

584

of counsel convinces us that the finding of the commission of the fair value of the property of $375,000 and its allowance of a gross operating revenue of $44,500 is not confiscatory, but is just and reasonable.

The order of the Public Service Commission is affirmed.