## Pittsburgh Motor Coach Company v. City of Pittsburgh et al.

*Henry G. Wasson, Jr., Philip A. Fleger, Edwin P. Griffiths* and *Charles K. Robinson,* for plaintiff.

*Ward Bonsall* and *William Kaufman,* for defendants.

GRAY, J., March 1, 1935.—The pleadings consist of the bill of complaint and answer, which raise an issue as to whether the ordinance of the City of Pittsburgh referred to in the findings and conclusion is confiscatory, unconstitutional, and void. Incident to this issue, plaintiff questions the constitutionality of the Act of June 1, 1915, P. L. 685, contending that the title of the act does not clearly express the subject-matter of it, and also contending that it was impliedly repealed by the enactment of subsequent motor vehicle codes.

### Findings of fact

From the pleadings and testimony we find the facts to be as follows:

1. The plaintiff, Pittsburgh Motor Coach Company, is a corporation of the Commonwealth of Pennsylvania and is engaged in the operation of motor buses for the transportation of passengers for hire over various scheduled routes in the counties of Allegheny, Washington, and Westmoreland, and also in group and party service from various points in said counties to various other points in the Commonwealth of Pennsylvania, pursuant to cer-

tificates of public convenience issued by the Public Service Commission of Pennsylvania at application docket no. 12430.

2. Ever since its organization, plaintiff has been and is a wholly owned and wholly controlled subsidiary of the Pittsburgh Railways Company, which operates the street railway system in the City of Pittsburgh and beyond. The plaintiff corporation was so organized on the insistence of the government of the City of Pittsburgh as constituted at the time.

3. Pittsburgh Motor Coach Company operates a number of scheduled routes located in whole or in part within the limits of the City of Pittsburgh, to wit, the Wilkinsburg, Shadyside, East Liberty, Pittsburgh-Charleroi, Squirrel Hill, Mt. Lebanon, Bellevue-Avalon, Pittsburgh-Oakmont, Oakmont (Allegheny River Boulevard), Frankstown Road, McKeesport, Highland, and Carnegie routes, charging for transportation over each route a cash fare of 25 cents, or a ticket fare of nine tickets for $2.

4. The cash fare of 25 cents and the ticket fare of nine tickets for $2, charged by the Pittsburgh Motor Coach Company, were established by its tariff designated as Bus-P. S. C. Pa. No. 9, issued July 12, 1934, effective July 14, 1934, duly posted, published and filed with the Public Service Commission of Pennsylvania in the manner provided for in The Public Service Company Law of July 26, 1913, P. L. 1374, and were first established by its tariff designated as Bus-P. S. C. Pa. No. 1, issued August 13, 1925, effective August 14, 1925, and later by its tariff designated as Bus-P. S. C. Pa. No. 3, issued June 30, 1928, effective July 2, 1928, which tariffs were also posted, published and filed with the Public Service Commission of Pennsylvania in the manner provided by law.

5. The defendant City of Pittsburgh is a city of the second class, situated in Allegheny County, Pennsylvania, and the defendant William N. McNair is the mayor of said

city and its chief executive officer and the defendant A. Marshall Bell was at the time of filing this bill Director of Public Safety of said city, the Director of Public Safety of said city at the present time being Thomas A. Dunn.

6. Council of the City of Pittsburgh, on November 19, 1934, passed an ordinance, no. 320, reading as follows:

"Providing for lower fares on passenger buses operating on regular routes in the city of Pittsburgh, and providing penalties for violation, and conferring jurisdiction of enforcement upon aldermen and police magistrates.

"Whereas, the fare of 25 cents a passenger now charged on motor buses operating on regular routes in Pittsburgh, is so unreasonably high that many persons refuse to patronize them, resulting in such reduced business that the company operates without adequate profit, causing reduction in service, which in turn causes further loss of business; and

"Whereas, it is reasonable to believe that lower fares would bring such an increase in business that more adequate service could be furnished to the public at greatly increased profits to the company; Therefore,

"Section 1. Be it ordained and enacted by the city of Pittsburgh, in council assembled, and it is hereby ordained and enacted by the authority of the same, that under the powers granted to the city by the act of assembly of June 1, 1915, P. L. 685, the maximum fare that may be charged on passenger buses operating in the city of Pittsburgh, on regular routes for a ride wholly within the limits of the city shall be fifteen cents.

"Section 2. That any person, firm, copartnership or corporation, or any officer, partner, agent or employee of any person, firm, copartnership or corporation, which or who shall receive, charge or collect more than the said maximum fare for a single trip from any passenger, shall be guilty of a violation of this ordinance, and for each offense shall be fined not to exceed one hundred dollars ($100.00) and costs, together with judgment, or impris-

onment not exceeding thirty (30) days, if the amount of said judgment and costs shall not be paid; and jurisdiction to enforce this ordinance is hereby specifically conferred upon aldermen and police magistrates within the City of Pittsburgh.

"Section 3. This ordinance shall become effective five days after its enactment into law.

"Section 4. That any ordinance or part of ordinance, conflicting with the provisions of this ordinance, be and the same is hereby repealed, so far as the same affects this ordinance."

7. The above ordinance was enacted pursuant to the Act of June 1, 1915, P. L. 685, which reads as follows:

"An act authorizing cities to regulate and license certain motor-vehicles.

"Section 1. Be it enacted, &c., That each city may regulate the transportation by motor-vehicles (not operated on tracks) of passengers or property, for pay, within the limits of the city, or from points in the city to points beyond the limits of the city. In such regulation the city may impose reasonable license fees, make regulations for the operation of vehicles, the rates to be charged for transportation, and may designate certain streets upon which such vehicles, if operated, must be operated."

8. Prior to the passage of ordinance no. 320, the City of Pittsburgh never attempted to regulate the rates or fares for motor bus companies in the City of Pittsburgh.

9. Prior to the passage of ordinance no. 320, the City of Pittsburgh never attempted to regulate the rates or fares of the Pittsburgh Motor Coach Company for the transportation of passengers within the limits of the City of Pittsburgh.

10. Since the effective date of The Public Service Company Law of July 26, 1913, P. L. 1374, the Public Service Commission of Pennsylvania has exercised jurisdiction over all matters pertaining to the regulation of the Pittsburgh Motor Coach Company, including the matter of

rates or fares and the granting of certificates of public convenience.

11. The maximum fare of 15 cents provided for in ordinance no. 320 was fixed without any consideration by council, or any committee or agency thereof, of any evidence, documentary or otherwise, bearing upon the value of the property of the Pittsburgh Motor Coach Company devoted to the public service or bearing upon the earnings of the company under its present fare structure, or upon any of the other elements required by law to be considered in the fixing of the rate of fare to be charged by a public service company, such as the cost of financing, working capital, going-concern value, depreciation, payment of interest, reserves, and reasonable return to capital.

12. While ordinance no. 320 was being considered by council, plaintiff was officially notified by council of the pendency of the ordinance and was requested to give its views thereon, and plaintiff, by two communications to council, acknowledged receipt of the notice.

13. While ordinance no. 320 was being considered by council, two conferences were held, one between two members of council and officials of plaintiff, in its own office, and the other at which the same officials conferred with substantially the entire membership of council.

14. Plaintiff did not produce any financial data relative to its business to the representatives of council at either of the conferences mentioned in findings of fact nos. 12 and 13, nor did the representatives of the City of Pittsburgh ask for any such data, the discussion which took place being of a general nature.

15. The maximum fare of 15 cents provided for in ordinance no. 320 was fixed arbitrarily without any adequate factual basis.

16. The operating revenues of the company for the years 1928 to and including the first 10 months of 1934 and the operating income for the same years, after allowance for operating expenses, including the company's

appropriation for depreciation and amortization, were as follows:

| Year | Operating Revenues | | Operating Income |
|------|-------------------|---|------------------|
| 1928 | $ 728,211.02 | | $ 46,180.65 |
| 1929 | 887,072.50 | | 33,188.07 |
| 1930 | 1,014,608.14 | (Deficit) | 72,975.36 |
| 1931 | 908,492.66 | (Deficit) | 79,154.08 |
| 1932 | 509,687.69 | (Deficit) | 204,227.14 |
| 1933 | 279,062.44 | (Deficit) | 156,421.68 |
| 1934 (10 months) | 236,147.28 | (Deficit) | 133,020.70 |

17. The total numbers of passengers carried by the plaintiff for the years 1928 to 1934, inclusive, were as follows:

| Year | |
|------|------|
| 1928 | 2,769,033 |
| 1929 | 3,332,506 |
| 1930 | 3,784,562 |
| 1931 | 3,300,927 |
| 1932 | 1,893,064 |
| 1933 | 1,112,107 |
| 1934 | 1,231,050 |

18. On the same basis as calculated in finding of fact no. 16, for 10 months actual and 2 months estimated, the operating revenues of the Pittsburgh Motor Coach Company for the year 1934 would be $284,550, resulting in a deficit of $158,004 in operating income.

19. Giving consideration only to the routes over which a minimum cash fare of 25 cents, or a ticket fare of nine tickets for $2 was charged by the company, with feeder lines and all other operations excluded, the operating revenues of the company for the years 1928 to 1933, inclusive, and the operating income of the company for the same years, on the same basis as calculated in finding of fact no. 16, were as follows:

| Year | Operating Revenues | | Operating Income |
|------|-------------------|---|------------------|
| 1928 | $ 728,211 | | $ 46,181 |
| 1929 | 882,260 | | 41,281 |
| 1930 | 983,560 | (Deficit) | 47,341 |
| 1931 | 881,101 | (Deficit) | 62,092 |
| 1932 | 493,722 | (Deficit) | 185,195 |
| 1933 | 266,454 | (Deficit) | 135,413 |
| 1934 | 235,969 | (Deficit) | 121,193 |

20. On a similar basis, during the year 1934 (for 10 months actual and two months estimated), as applied only to the routes over which a minimum cash fare of 25 cents, or a ticket fare of nine tickets for $2, was charged by the Pittsburgh Motor Coach Company, with feeder lines and all other operations excluded, the operating revenues of the Pittsburgh Motor Coach Company would be $235,969, resulting in a deficit of $121,193 in the operating income.

21. The above-estimated deficit of $121,193 in operating income for the year 1934 would be further increased if consideration were given only to the operations of such routes wholly within the limits of the City of Pittsburgh, and the results of operations outside of the City of Pittsburgh were excluded from the calculation.

22. A reduction in fare from 25 cents to 15 cents would require a two-thirds increase in passengers in order to produce the same gross income.

23. Plaintiff's witnesses estimated that under existing conditions they would not expect an increase in passengers in excess of 50 percent within the limits of the City of Pittsburgh if the fare charged by the plaintiff were reduced to a maximum of 15 cents. The defendants furnished no competent testimony on the subject of rates which can be followed by the court.

24. Plaintiff's witnesses estimated that under existing conditions a 50 percent increase in passengers would increase the operating costs of the company by $6,892 per annum, and would reduce the gross income by $1,812, and would thereby increase existing deficits in operating income.

25. Plaintiff's witnesses estimated that if under existing conditions it were possible to increase passengers 100 per cent there would be increased operating costs which would result in leaving the same deficits of operating income as actually exist under present fares.

Plaintiff's expert witnesses declined to furnish an esti-

mate which would show how many passengers it would be necessary to carry at a maximum fare of 15 cents to secure enough revenue to provide a net revenue which would amount to a fair return on the property of plaintiff devoted to public use. But one of their expert witnesses did testify that to match the gross revenue of the plaintiff for the year 1928, in which it carried 2,769,-033 passengers, the company would be obliged to carry 4,800,000 passengers at the fare of 15 cents, which would necessitate increased operating expenses and, therefore, reduce the net operating income. This would seem to indicate that if the number of passengers carried increased in great enough numbers in excess of 4,800,000, there would come a point where there could be a profitable operation; but, as stated, the plaintiff's witnesses declined to furnish any estimates on that aspect of the case, and, as stated in a prior finding of fact, the testimony offered by defendants was incompetent for the purpose. On the record in this case it is entirely conjectural as to the number of passengers it would be necessary for plaintiff to carry in its buses to produce enough net revenue to furnish a fair return on the value of its property devoted to public use at a maximum fare of 15 cents in the City of Pittsburgh.

27. As of October 31, 1934, the assets of the Pittsburgh Motor Coach Company, according to the balance sheet in evidence, amounted to $776,582.90, of which amount $742,067.37 represented fixed capital.

28. As of October 31, 1934, the liabilities of the Pittsburgh Motor Coach Company, according to the balance sheet in evidence, totaled $1,510,820.84, or $734,237.94 in excess of the assets of the company. The largest item of the liabilities is an indebtedness to the Pittsburgh Railways Company in the sum of $780,000, stated to be for money advanced by the Pittsburgh Railways Company to plaintiff.

29. As of October 31, 1934, the Pittsburgh Motor Coach Company owned a total of 82 coaches, which cost

the company $619,422.88, and which, after deduction of depreciation, as charged in plaintiff's accounting, had a total net value of $81,342.66 as of said date..

30. The fare of 25 cents, or nine tickets for $2, charged by the plaintiff for transportation of passengers within the City of Pittsburgh, is one of the highest fares charged by any bus company in the United States. There are bus operations in Pittsburgh and vicinity on which a fare of 15 cents is charged, one of which is a line competing with one of the lines of plaintiff, but these are all lines with one route, or are minor operations as compared with that of the plaintiff. There is no evidence in this case that those operations pay a fair return on the value of the property involved, nor whether their financial structures are set up on such a basis as is recognized as sound and lawful in public service company operations; and there is no evidence in this case that the operations of companies charging 15 cents are in anywise similar to the business of the plaintiff.

31. Plaintiff, in October or November 1934, applied for and obtained from the Public Service Commission a certificate of public convenience for the establishment of a new route, extending on Stanton Avenue from Negley Avenue to Butler Street, a distance of approximately two miles, and it is charging only a 5-cent fare on that route, which plaintiff claims is a feeder route.

32. It is the declared policy of the plaintiff in the operation of its buses to offer a type of transportation to compete with the private automobile but not to compete with the Pittsburgh Railways Company. This policy is dictated by the policy of the Pittsburgh Railways Company, which is to furnish mass transportation in Pittsburgh by street car service at a low rate of fare, which the trolley car service is considered by plaintiff to be. The officers of the plaintiff company who testified stated that a new type of trolley car had been developed which it was expected would be put into use in the not

far distant future, and that through this type of car, which is almost noiseless and much lighter than the present street cars, the expectancy is that much better street-car service will be furnished and that this will be satisfactory to the great body of the people of this community who do not travel back and forth to work in their own automobiles. In fact, these officers expressed the opinion that the service would probably be so satisfactory that there would be no demand for bus service. The plaintiff does not offer, and does not intend to offer, bus service to the great body of people who ride on the street cars. Plaintiff offers the bus service at the fare of 25 cents, expecting that there will be no short hauling at that fare, and that this fare will be no attraction to the great majority of people who use the street cars on account of the more moderate fare. These officers are of the opinion that a reduction of the bus fare to 15 cents would attract large numbers of car riders from the street cars to the buses and thereby impair the ability of the Pittsburgh Railways Company to furnish satisfactory service to its car riders and compel it to reduce service to them. Plaintiff's officers who testified were of the opinion that the unprofitableness of plaintiff's business was due to the depression, citing the favorable results of the operations of the company's business in 1928 and 1929. They are hopeful that when normal times are restored they will again be able to operate at a profit at the 25-cent fare. Plaintiff's officers also testified they have little or no complaint about the fare from their bus riders.

### Conclusions of law

1. Pittsburgh Motor Coach Company is a common carrier of passengers and a public service corporation within the meaning of The Public Service Company Law of 1913, supra, and its several supplements and amendments.

2. The Act of 1915, supra, entitled "An act authoriz-

ing cities to regulate and license certain motor-vehicles", quoted in full in finding of fact no. 7, in the grant of powers to cities to "impose . . . the rates to be charged for transportation", is not in violation of article III, sec. 3, of the Constitution of Pennsylvania, which requires the subject of every bill to be clearly expressed in its title, and is constitutional.

3. The Act of 1915, supra, does not empower the City of Pittsburgh arbitrarily to fix a maximum fare as it attempted to do in ordinance no. 320.

4. The Act of 1915, supra, in the grant of powers to cities to "impose . . . the rates to be charged for transportation", was not repealed by section 28 of The Motor Vehicle Code of June 30, 1919, P. L. 678, or by any subsequent amendment to said code, or subsequent motor vehicle codes enacted in substitution therefor.

5. The Act of 1915, supra, and The Public Service Company Law must be read together, and the requirements of The Public Service Company Law with respect to notice, hearing, and consideration of evidence in fixing rates or fares should be substantially followed by cities in proceeding under the Act of 1915. These two acts have been held to be harmonious in several respects, and unless there is an absolute inconsistency between the provision of the Act of 1915 as to regulation of rates and The Public Service Company Law, proceedings by cities to exercise the rate-making powers given by the Act of 1915 should be in harmony with the terms of The Public Service Company Law.

6. In The Public Service Company Law of 1913, and the subsequent amendments thereto, the Commonwealth of Pennsylvania has established a general policy of regulating public service companies and has thereby conferred jurisdiction upon the Public Service Commission in fixing rates and charges for the plaintiff company within and without the limits of the City of Pittsburgh. It has been held that the Act of 1915 did not repeal The

Public Service Company Law in provisions thereof not relating to rates. If the provisions of the Act of 1915 relating to the regulation of rates or fares to be charged in the transportation of passengers in certain motor vehicles cannot be harmonized with the provisions of The Public Service Company Law, then the provisions of the said latter law in regard to the fixing and regulating of rates would be suspended in cities where rates were lawfully fixed by ordinance under the Act of 1915.

7. In the absence of any lawful ordinance of the City of Pittsburgh establishing a lawful rate of fare to be charged by the Pittsburgh Motor Coach Company, that company has the right to establish the fare to be charged by it for the transportation of passengers by motor bus within the limits of the City of Pittsburgh, and the fare so established becomes and remains the only lawful fare that may be charged and collected by it until changed by the said Pittsburgh Motor Coach Company or altered or revised by the Public Service Commission of Pennsylvania in the manner provided for in The Public Service Company Law, or superseded by a fare fixed by lawful ordinance of the City of Pittsburgh.

8. Under article I, secs. 9 and 10, of the Constitution of Pennsylvania, and section 1 of the fourteenth amendment to the Constitution of the United States, the Pittsburgh Motor Coach Company is entitled to earn, if it can, a fair return on the present fair value of its property used and useful in the service of the public.

9. A rate or fare which is so low as to preclude the Pittsburgh Motor Coach Company from earning a fair return on the present fair value of its property used and useful in the service of the public is confiscatory and denies to the company the due process of law assured to it by article I, secs. 9 and 10, of the Constitution of Pennsylvania, and section 1 of the fourteenth amendment to the Constitution of the United States.

10. The issue of confiscation must be determined on

the basis of the existing plant and facilities of the plaintiff company and on its present operations and not upon the basis of a substitute plant or upon other or theoretical operations.

11. Under article I, secs. 9 and 10, of the Constitution of Pennsylvania, and section 1 of the fourteenth amendment to the Constitution of the United States, rates may not be established for public service corporations by any body subordinate to the State legislature without consideration of the value of their property devoted to the public service, and without consideration of their earnings under existing rates and the probable effect of the rates to be prescribed on said earnings, and without consideration of all the essential and available data from which a reasonable finding can be made, and without an opportunity afforded the interested companies to be heard on their own behalf.

12. Ordinance no. 320 of the City of Pittsburgh is unreasonable, confiscatory, made without due process of law, and is without authority of law and void.

## Discussion

The Public Service Company Law became a law July 26, 1913. The act of assembly under the authority of which the City of Pittsburgh passed the ordinance involved in this case became a law June 1, 1915. This Act of June 1, 1915, and its relationship to the Act of 1913, has been considered and discussed in Jitney Bus Association of Wilkes-Barre v. City of Wilkes-Barre, 256 Pa. 462 (1917); Scranton Railway Co. v. Fiorucci, 66 Pa. Superior Ct. 475 (1917); Setzer v. City of Pottsville, 73 Pa. Superior Ct. 573 (1920); and Collins et al. v. Public Service Comm., 84 Pa. Superior Ct. 58 (1924). In none of these cases was the question of rates involved.

In Scranton Railway Co. v. Fiorucci, supra, the Superior Court held that the Act of 1915 did not impliedly repeal The Public Service Company Law of 1913, and

that there was no irreconcilable inconsistency between the two acts, and upheld an order of the Public Service Commission refusing a certificate of public convenience for a jitney-bus service.

In Setzer v. City of Pottsville, 73 Pa. Superior Ct. 573, there was an ordinance of the city requiring automobiles, taxicabs, etc., to operate on certain streets, which required the plaintiff to change a part of its route within the city limits from the route specified in the certificate of public convenience from the Public Service Commission. It was contended that the Public Service Commission had superior jurisdiction, but the court held this was not so, stating, among other things: "This statute [Act of June 1, 1915] was enacted subsequently to the approval of the Public Service Company Law and if there is any conflict between them the later statute must, of course, prevail." The court further stated:

"The Public Service Company Law did not make the municipalities public service companies, and cities and boroughs, acting strictly as such, are unaffected by it in the exercise of their functions and powers and in the performance of their municipal duties . . . The Act of 1915 conferred upon cities power to pass ordinances of a specific and defined character, to 'designate certain streets upon which such vehicles, if operated, must be operated.' When the legislative grant is of this specific character an ordinance passed pursuant thereto cannot be impeached as invalid because it would have been regarded as unreasonable if passed under the incidental power of the municipality, or under a grant of power general in its nature."

In Collins et al. v. Public Service Comm., supra, the Act of 1915 was again considered, and it was held that the City of Chester had authority to adopt general reasonable regulations applicable to all motor vehicles transporting passengers for pay within the city, and to desig-

nate certain streets upon which said vehicles might operate; and that no individual or company had the right to operate such motor vehicles as a common carrier for the transportation of passengers, without first obtaining from the Public Service Commission a certificate of public convenience.

In Jitney Bus Association of Wilkes-Barre v. City of Wilkes-Barre, supra, the Supreme Court said: "The Act of Assembly of June 1, 1915, P. L. 685, gave to cities in Pennsylvania the right to regulate the transportation of passengers and property by motor vehicles not operated on tracks"; and affirmed a decree dismissing a bill in equity to enjoin the enforcement of a city ordinance regulating jitneys, no question of rates being involved. Among other things, the Supreme Court said:

"As to the right of the municipality to regulate, in the interest of public safety, the running of jitneys, as well as all other traffic upon the public streets, we have no doubt. The only question in such case is whether the requirements of an ordinance for that purpose are reasonable, and not unduly burdensome. Regulation is not to be carried to the extent of prohibition."

The only case in which the rate-making power of cities under the Act of 1915 has been considered by the courts is the case of the Philadelphia Jitney Assn. et al. v. Blankenburg et al., in the Court of Common Pleas of Philadelphia County, reported in 24 Dist. R. 1000. In this case some jitney operators brought a bill to enjoin the enforcement of an ordinance of the City of Philadelphia, passed on July 2, 1915. The ordinance provided that jitney buses could only be operated over certain city streets, regulated the operation of the buses in other respects, and forbade the charging of over 5 cents for a continuous ride over a whole route. The court held that the City of Philadelphia under the Act of 1915, and other acts of assembly, had the power to enact the ordinance in question fixing jitney bus fares and regulating trans-

portation of passengers by jitney buses in other respects, requiring license fees to be paid. This case was not appealed and stands alone as the only case in which the rate-making power of cities under the Act of 1915 has been considered. While this case occurred a very short time after the passage of the Act of 1915 and in the early days of The Public Service Company Law, and at a time when there was an impression that the Public Service Commission did not have jurisdiction over what were called jitney bus operations, and may therefore not be a very impressive authority, it is entitled to consideration; and in this connection we should say that the argument of counsel for the plaintiff that the legislative record covering the enactment of the Act of 1915, in which there was much discussion of jitney bus operations and the necessity of controlling them, shows that the Act of 1915 should be confined in its application to what were then called jitney buses, does not convince us. It seems to us that it is very plain that what the members of the legislature had in mind was the control of the carriage of passengers in cities by motor vehicles other than street cars. In those days there was no such motor coach service as is given now by the Pittsburgh Motor Coach Company, the service of this nature first offered being that of individual operators of motor vehicles, each one, or at least small groups of automobiles, being operated independently of others. But we see no justification for confining the terms of the Act of 1915 to the character of service first developed. The language is general, and if the act is valid it applies to the operations of the plaintiff as well as to that of smaller or individual operators of similar service.

In addition to the recognition by the courts of the existence and validity of the Act of 1915 long after the enactment of section 28 of The Motor Vehicle Code of 1919, we have a direct recognition of the Act of 1915 as in force and effect, by the General Assembly of the Common-

wealth of Pennsylvania, in the Act of June 23, 1931, P. L. 932, relating to third-class cities, which contains a clause expressly repealing the Act of 1915 as to third-class cities, thus recognizing the Act of 1915 as being a valid and subsisting act of assembly as to all other cities. Counsel for plaintiff contends that though the Act of 1915 is in force as to its other terms, the provisions in the act granting cities power to prescribe rates have been impliedly repealed by The Motor Vehicle Code of 1919. We have considered counsel's argument and brief on this aspect of the case carefully, but we are of the opinion their position is not tenable in light of the fact of the recognition of this act so many times by the courts and the General Assembly and the dissimilar objects of the Act of 1915 and the motor vehicle codes. We hold that the Act of 1915 is not repealed by The Motor Vehicle Code of 1919, or any subsequent amendment to that act or any act substituted therefor.

We are of the opinion nothing would be gained by the discussion of the many cases cited by counsel for plaintiff on the subject of the adequacy of the titles to acts of assembly. The general rules are well established; the difficulty is in the application of the rule to the title of a particular act. We will refer only to the recent case of Mallinger v. Pittsburgh, 316 Pa. 257, where this subject was discussed. The familiar rule was stated by the Supreme Court (p. 261) :

"The constitutional provision (article III, section 3) . . . was intended merely to prohibit the practice of passing what were known as 'omnibus' bills, containing subjects foreign to each other, and whose title was on that account calculated to mislead and deceive; and a bill may still contain any number of provisions properly connected with and germane to the expressed subject, without violating the constitutional requirement."

There is only one subject covered by the Act of 1915. It is the regulation by cities of the use of motor vehicles

for transportation of passengers and property for hire within the limits of cities. The fundamental power involved is the power given to cities to regulate the operation of motor vehicles on city streets. This act was passed within two years after the passage of The Public Service Company Law and, therefore, gives to cities what the courts have stated to be a coördinate jurisdiction over motor vehicles operated on city streets for the transportation of passengers and property for hire. The title of the act is sufficient to indicate clearly that cities are given this jurisdiction over the operation of motor vehicles within their boundaries. The power given them is to regulate and license the use of certain motor vehicles. While the wording of the title could have been more artistic, it seems to us it is reasonable to hold that it clearly indicates cities are given power to regulate motor vehicles in use on city streets and to license such use. Regulate is a word with a broad meaning. Among other things, it means "to fix the time, amount, degree, or rate of, by adjusting, rectifying, etc.": Webster's New International Dictionary. It is the duty of courts to sustain acts of assembly unless they are clearly unconstitutional. Notwithstanding the able argument presented in behalf of the plaintiff's position that the Act of 1915 is unconstitutional, we are not persuaded we should declare this act unconstitutional on account of the inadequacy of the title.

It is settled law in Pennsylvania, and elsewhere in the United States, that a public service company is entitled to earn a fair return on the present fair value of its property devoted to the service of the public, and that a rate or fare which is so low as to prevent the company from earning such a return is confiscatory: Public Service Comm. v. Beaver Valley Water Co., 271 Pa. 358 (1921) ; Bangor Water Co. v. Public Service Comm., 82 Pa. Superior Ct. 48 (1923) ; Erie City et al. v. Public Service Comm., 278 Pa. 512 (1924) ; Lehighton Water

Supply Co. v. Public Service Comm. et al., 99 Pa. Superior Ct. 574 (1930).

A "fair return" should allow for the payment of operating expenses, including taxes and an adequate depreciation, and still leave something to be set aside to capital, and a rate or fare which does not permit of such a return violates the Constitution: City of Erie v. Public Service Comm., 96 Pa. Superior Ct. 42 (1929) ; United Rys. & Elec. Co. of Baltimore v. West, etc., et al., 280 U. S. 234.

Unfortunately for everyone concerned, the defendants furnished no competent testimony at all from which the court can make any finding on the rate question involved in this case. The only witness offered by the defendants on the subject of rates was a very highly respected engineer who, however, never had any experience in the operation of a common carrier of passengers, nor any other experience which would sustain his opinion on the question of rates involved in this case. We afforded defendants great latitude in the introduction of the testimony of this witness, but when his testimony was all in it appeared beyond all doubt that the criticism of the plaintiff's financial set-up and the operation of plaintiff's business was only the personal opinion of the witness based upon no sufficient experience and data to sustain his opinion. He was of the opinion that the charges of the plaintiff for operating expenses were too high, but he had not actually investigated plaintiff's business to discover whether these operating expenses were reasonable; he simply assumed they were not actually necessary, and also assumed that a much smaller figure was all that should have been expended for operating expenses; and so it was with his criticism of the plaintiff's expenditures for maintenance of equipment and depreciation; he assumed the plaintiff's charges were excessive and set a figure of his own in place of the figures of the plaintiff, but he could not justify his own figures because they were not based upon experience. As an illustration, this ex-

pert witness for defendants testified that plaintiff charged up too much for the rental of the building where it stored buses; when asked if he knew any building which could be procured for a smaller rent, he knew of none; and when he came to give his opinion that a fare of 15 cents would be sufficient to enable plaintiff to operate its business at a profit, it turned out that his figures represented a mere fanciful operation of buses and had no relation whatever to the operation of plaintiff's buses or any other buses on the routes over which plaintiff's buses are now operated; his figures had no relation to any particular routes, but were what might be called an imaginary set of figures indicating that with a certain number of passengers per mile, and a certain number of buses operating a certain number of miles, the cost of operation would be covered when a certain number of passengers were carried.

We are thus left to make our findings on the question of rates wholly on the testimony furnished by the plaintiff—testimony which it was frankly conceded was intended to sustain the policies of the plaintiff company and the Pittsburgh Railways Company in the operation of their services to the people of Pittsburgh. This leaves the court in a very unsatisfactory situation. We should have been furnished with an audit of the plaintiff's books and records, and with the testimony of competent operators of common carriers of passengers in buses, and if there are other persons or corporations willing to furnish such a service as is operated by the plaintiff at a 15-cent fare or any other fare less than that charged by the plaintiff, they should have been brought forward to testify. On the record in this case there are no such parties offering to compete with the Pittsburgh Motor Coach Company or replace the plaintiff by a service similar to that of plaintiff at rates less than those charged by the plaintiff. We are not persuaded that the plaintiff's charges for operation, maintenance of equipment, and depreciation

are justifiable, and yet we have no other testimony than that offered by the plaintiff on which to decide the question involved. As we read the plaintiff's financial statements, there seems to be about $380,000 of depreciation which is not reflected in its balance sheet. Where this went is not revealed. The percentage of operating income charged to conduct transportation increased from 37.7 percent in 1928 to 73.4 percent in 1934, and the percentage of operating income charged to maintenance of transportation, plant, and equipment rose from 22.7 percent in 1928 to 33 percent in 1934. These charges seem excessive. Depreciation and amortization charges seem to be extraordinary considering the value of the property involved. Therefore, our findings are limited by the condition of the record and are not intended to be final findings as to the operation of the business of the plaintiff in the future or as to the question of rates in the future when business conditions return to normal. The testimony on behalf of the plaintiff directed to the question of confiscation, making allowance for the partisan character of this testimony, leaves no doubt at all that at the present time the maximum fare of 15 cents established by ordinance no. 320 of the City of Pittsburgh is confiscatory.

If the evidence offered by the plaintiff should be accepted and its accounting methods justified, what is happening now is that the patrons of the Pittsburgh Railways Company are now paying for a very considerable part of the expense of operating the buses of the Pittsburgh Motor Coach Company and the bus riders of the Pittsburgh Motor Coach Company are not paying fully for the privilege of riding in buses. If this is so a reduction of the bus fare to 15 cents would put a still larger burden upon the car riders of the Pittsburgh Railways Company and require them to pay a still further share of the expense of operation of the buses of the Pittsburgh Motor Coach Company, and the result would be

that a comparatively few people would be afforded bus service at the expense of the multitude who ride in the trolley cars. Such a condition should not be aggravated or perpetuated. The bus riders should pay for their own service and the car riders should have their contributions to the operation of the Pittsburgh Railways Company applied for their own benefit and for improved street-car service.

Courts have required a trial period at new rates where the question as to the reasonableness of rates is a close one. We would unhesitatingly follow that practice in this case if there were any reason to believe that a moderate trial period would demonstrate that plaintiff could carry on its operations profitably at a 15-cent fare; but the matter seems so clear that we are of the opinion such a trial period must be deferred until business conditions are such that plaintiff's business would be restored at least to something like the conditions of 1929 or 1930.

The great weight of authority in this country is that a body subordinate to the State legislature, such as a public service commission or a city council, cannot constitutionally fix rates arbitrarily without consideration of evidence and without an opportunity to the public service company involved to be heard on its own behalf: Cumberland Tel. & Tel. Co. v. Railroad Commission of La., 156 Fed. 823 (1907) ; Indiana General Service Co. v. McCardle, 1 Fed. Supp. 113 (1932) ; Illinois Central Railroad Co. et al. v. United States et al., 3 Fed. Supp. 1005 (1933) ; Georgia Continental Tel. Co. v. Georgia Public Service Comm. et al., 8 Fed. Supp. 434 (1934) ; Laclede Gas Light Co. v. Public Service Comm. of Mo. et al., 8 Fed. Supp. 806 (1934) ; Northern Pac. Ry. Co. et al. v. Department of Public Works of Wash. et al., 268 U. S. 39.

That there is a settled practice requiring a comprehensive investigation into the facts of a case before a rate can be lawfully established has been stated in the

case of Cumberland Tel. & Tel. Co. v. Railroad Commission of La., 156 Fed. 823, 828:

"Where the facts are not known or inquired into, the regulations made by any Commission would be mere arbitrary edicts, or, at best, only conjectures made in good faith, and tested at the expense of the regulated corporations. The whole spirit of our institutions revolts at the idea that any Commission or department of the government should be vested with such arbitrary and irresponsible power over the fortunes or business of any persons whatever, even though they belong to the much harassed and perplexed legal persons known as public service corporations. In view of the fact that the Constitution in express terms authorizes the Commission only to establish 'reasonable and just rates, charges and regulations,' and of the further fact that the reasonableness and justice of such rates, charges, and regulations cannot be even conjectured intelligently without exact knowledge of the facts, I should have no hesitation in concluding, though there were nothing else in the Constitution but the bare mandate to establish reasonable and just rates, etc., that the Constitution by implication requires the Commission to make full and adequate investigation into the facts before it exercises its powers."

While this case was reversed by the United States Supreme Court, the statement of the rule of practice in rate matters by the trial court was not affected by the decision.

The requirement of what may be called a scientific investigation into the facts of a rate case and the duties of the court in reviewing such cases was recognized and defined in the case of Northern Pac. Ry. Co. et al. v. The Department of Public Works of Wash. et al., 268 U. S. 39, 44, in the following language:

"But where rates found by a regulatory body to be compensatory are attacked as being confiscatory, courts may enquire into the method by which its conclusion was reached. An order based upon a finding made without

evidence, *The Chicago Junction Case*, 264 U. S. 258, 263, or upon a finding made upon evidence which clearly does not support it, *Interstate Commerce Commission* v. *Union Pacific R. R.*, 222 U. S. 541, 547, is an arbitrary act against which courts afford relief. The error under discussion was of this character. It was a denial of due process."

Though there are no Pennsylvania cases authoritatively establishing the rate-making practice called for in the cases we have just cited, The Public Service Company Law of Pennsylvania, in confiding to the Public Service Commission general supervision of rates charged by public service companies, undoubtedly intended to be the general regulatory power in such cases throughout the State, requires the Public Service Commission to investigate the facts of the cases before it and to hold public hearings before taking any action in regard to rates. Our Public Service Commission does conform to the settled practice in rate making which is general throughout the United States. This practice is so absolutely necessary in order to provide intelligent and just regulation of public service companies that it is against reason to refuse to follow the methods developed by the most qualified rate-making bodies.

It is absolutely impossible to do justice to a common carrier by a mere arbitrary decree fixing rates of fare based upon nothing but hearsay or desire. The time has come when courts should not sanction rate-making procedure in any authority less than the supreme legislative authority of the State without such a thorough-going investigation of the facts of the case as will afford a rate-making body adequate information upon which a reasonable finding can be made.

The evidence is uncontradicted that the authorities of the City of Pittsburgh in passing ordinance no. 320 did not conform to the requirements of the law, and, the rate established being so clearly unjustifiable as applied to

the business of the plaintiff, we have no hesitancy in declaring ordinance no. 320 invalid because it was enacted without due process of law and is clearly confiscatory.

Speaking of the Act of 1915, as to practically all of the terms of that act, except the clause relating to the power of the city to fix rates, the Superior Court has declared that the Act of 1915 and The Public Service Company Law of 1913 are both operative and should be administered together. There may be some difficulty in harmonizing the rate-making authority of the Public Service Commission and of cities, but it seems to us there ought to be no insuperable difficulty in effecting coöperative enforcement of these two laws by cities which undertake to act under the Act of 1915 and the Public Service Commission. It seems to us that, when the time arrives when the business of the plaintiff company has revived to something like its high point in 1929 or 1930, by a joint investigation by the City of Pittsburgh and the Public Service Commission, which latter body has much better facilities for such an investigation than are available to the city without setting up special machinery for the purpose, a lawful inquiry into the propriety of rates charged by plaintiff for bus service in Pittsburgh could be made and a lawful decision arrived at as to the reasonable and just rate which should be charged for bus service, and a reasonable rate prescribed either by the Public Service Commission or by ordinance of the City of Pittsburgh, or by both, by which justice could be done to the public and also to the plaintiff corporation or other operators of buses within the City of Pittsburgh.

The policy of the plaintiff and of the Pittsburgh Railway Company to operate the street car service and the bus service without competition was sanctioned and upheld in the case of Young v. Pittsburgh Motor Coach Co., 10 P. S. C. Rep. 694. It appears from the decision in that case that the Public Service Commission's judgment approving the policy of the plaintiff and the Pittsburgh Railways Company in their determination to provide mass

transportation through the service of the Pittsburgh Railways Company and bus service at a 25-cent fare through the Pittsburgh Motor Coach Company, avoiding competition between the two services, was based upon the approval of that policy by the officials of the City of Pittsburgh at that time administering the city government. The Public Service Commission expressly said it would be hesitant to decline to support the policy of the city in the matter involved. The present administration of the City of Pittsburgh has a different attitude towards this problem and, if public reports are to be accepted, the present Public Service Commission of Pennsylvania has a different attitude on rate making than has been maintained by that commission in times past; from which it seems reasonable to conclude that the city and the Public Service Commission could coöperate in a new consideration of the matter of bus rates in the City of Pittsburgh and, by procedure which will conform to the requirements of the law, determine whether the rate charged by the Pittsburgh Motor Coach Company is excessive, and whether a lower rate, and if so what rate, would be reasonable and afford the public service company a proper return for its service to the public.

The Pittsburgh Railways Company and the Pittsburgh Motor Coach Company have a monopoly by the authority of the Public Service Commission of Pennsylvania. The City of Pittsburgh cannot authorize competitive service against the Pittsburgh Motor Coach Company because the Superior Court has decided that common carriers must obtain a certificate of public convenience from the Public Service Commission notwithstanding the Act of 1915. The Government must see that the monopoly which the plaintiff and the Pittsburgh Railways Company have is not used oppressively. We rightly resent arbitrary fixing of rates by a monopoly as we must deny the right of the city council to fix an arbitrary rate. The city is rightfully active in the matter and should see to it that the Public Service Commission requires bus service in the

City of Pittsburgh to be rendered at just and reasonable rates, or the city should establish such rates on its own motion. But whichever governmental agency undertakes to exercise this function of the Government it must be done in a lawful way with due process of law and without confiscation.