*Decision will be entered under Rule 50.*

BEN TURCHIN, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

GERTRUDE F. TURCHIN, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

MORRIS SCHWINGER, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 21250, 21251, 21271. Promulgated May 29, 1951.

---

*§ 845.521-3, Joint Termination Regulation, 9 Fed. Reg. 13359.

*W. G. Ward, Esq.*, and *W. W. Arner, C. P. A.*, for the petitioners.
*Percy C. Young, Esq.*, for the respondent.

1188

## OPINION.

TURNER, *Judge:* Petitioners contend in these proceedings that the respondent should have allowed the increased deduction claimed by them in their partnership income tax return for the fiscal year ended November 30, 1942, to compensate them for abnormal depreciation suffered by their hotel property and furnishings during the occupancy of the hotel by Army Air Corps troops from June 19 to November 30, 1942.

A reasonable allowance for the exhaustion, wear and tear, and obsolescence of the property used in the trade or business may be deducted from gross income, as provided by section 23 (l) (1) of the Internal Revenue Code[5] and section 29.23 (l)-1 of Regulations 111.[6]

The petitioners took, and the respondent has allowed a deduction for normal depreciation. The respondent did make some adjustment of the partnership's basis for the hotel properties and a small part of the deficiency in each case resulted from that adjustment. The petitioners are not here contesting the adjustment of basis, and effect will be given thereto in computations to be made under Rule 50.

It is the contention of the petitioners that, due to Army occupancy and use, the hotel properties suffered unusual damage of a general nature over and above the ordinary wear and tear which would reasonably have been sustained if the hotel had been subjected to use as a hotel, that the greater part of this unusual damage occurred during the first weeks of Army occupancy and still obtained at November 30, 1942, the close of the partnership's fiscal year, and that by reason thereof, the partnership, in reporting its income for said year, was entitled to a deduction for depreciation over and above normal depreciation to cover the unusual damage, and this, without regard to any right of indemnification or any subsequent payment therefor by the Government. The petitioners' counsel argues that the subsequent compensating payments received by the partnership in 1943 are comparable to recoveries on debts which became worthless and were deducted in a prior year and have no bearing whatever on the right of the partnership to the "accelerated" depreciation deduction claimed by the partnership for the fiscal year 1942, and disallowed by the respondent.

That the above contention of the petitioners is not well taken, is immediately apparent, when the nature and purpose of the depreciation allowance is considered and understood. It is the normal and expected thing that physical properties used in a business operation

[5] SEC. 23. DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions:

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

(1) DEPRECIATION.—A reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—

(1) of property used in the trade or business, &ast; &ast; &ast;

[6] SEC. 29.23 (l)-1. DEPRECIATION.—A reasonable allowance for the exhaustion, wear and tear, and obsolescence of property used in the trade or business, or treated under section 29.23 (a)-15 as held by the taxpayer for the production of income, may be deducted from gross income. For convenience such an allowance will usually be referred to as depreciation, excluding from the term any idea of a mere reduction in market value not resulting from exhaustion, wear and tear, or obsolescence. The proper allowance for such depreciation is that amount which should be set aside for the taxable year in accordance with a reasonably consistent plan (not necessarily at a uniform rate), whereby the aggregate of the amounts so set aside, plus the salvage value, will, at the end of the useful life of the depreciable property, equal the cost or other basis of the property determined in accordance with section 113. Due regard must also be given to expenditures for current upkeep. &ast; &ast; &ast;

will eventually be consumed. Where there has been no sale of plant, as such, and there is no means or right of recovery for its consumption, except through the sale of goods produced or the letting of the property to the use for which it was constructed, acquired or held, the owner must, of necessity, look to gross profits or receipts for recovery of the plant or capital consumed in the production of those profits. In that case, a reasonable allowance to cover the consumption of the plant or capital becomes a proper charge on profits. On the other hand, to the extent that the owner of the property is otherwise indemnified for the damage and wear and tear to the property and does not have to look to operating profits for the recovery of the capital consumed, then there is no basis, in reason or in fact, for a charge of such wear and tear against those profits.

Here, by the specific terms of the lease, the Government was required to "restore the premises to the same conditions as that existing at the time of entering upon the same," reasonable and ordinary wear and tear excepted. It thus appears that except for reasonable and ordinary wear and tear, damage to or consumption of the property by reason of Army occupancy was at no time a proper or reasonable charge against income—in this instance, the rents received. To the contrary, any damage or consumption over and above reasonable and ordinary wear and tear became a charge against the Government and the owners of the hotel properties were at all times indemnified therefor. It is at once apparent, therefore, that the allowance of the deduction claimed to cover damage or added wear and tear over and above reasonable and ordinary wear and tear would not only be an unreasonable allowance for exhaustion, wear and tear of the hotel properties, but would permit the petitioners a double recovery for such damage and added wear and tear, one by way of a charge against the rents received and reported as income, and the other, by way of a valuable and subsisting claim against the Government for recovery under the lease. At this point, it may be observed that any comparison of the Government's obligation under the lease in 1942 to a worthless debt is, to say the least, inept.

The petitioners cite and rely upon numerous cases wherein an added depreciation deduction has been allowed, due to abnormal and increased use of the property used by taxpayers in the trade or business. Those cases are not in point, and give no support to the petitioners' contention here. There the taxpayers had no indemnitors for such added wear and tear, but could look only to operating profits for recovery of the capital items consumed in the operations in question. Such was not the case here.

If we follow and understand it correctly, one argument advanced by the petitioners' counsel is that Army representatives took the

position that the Government, by the terms of the lease, was liable only for damage beyond that resulting from the wear and tear which might reasonably and ordinarily be expected from use of the hotel as army barracks, while the petitioners claimed that, by the terms of the lease, the Government was liable for all damage beyond that resulting from the wear and tear which might reasonably and ordinarily be expected from use of the property as a resort hotel; that regardless of the money settlement later made, this difference as to the proper interpretation of the lease has never been finally determined, and that justification of the claim for added or accelerated depreciation for 1942 is accordingly established. A further or supporting contention seems to be that it necessarily follows that the damage was such that restoration could not be effected by means of repairs alone, and, as a consequence, there was a demonstrated shortening of the life of the hotel for which there was never any compensation or right of compensation.

If such is the theory of counsel, we must still conclude, on the record here, that the right to the deduction claimed has not been established. Except for such conclusions as may be drawn from the wording of the contention itself, the record supplies no yardstick by which we can determine what the margin of difference would be between the wear and tear which might reasonably be expected from the use of the premises as army barracks and their use as a hotel. It is true the amount deducted on the partnership return as accelerated depreciation was $30,348.09. But from the evidence which the petitioners themselves have developed and made of record, it is abundantly clear that that amount may not be regarded as representing only the margin of difference which might have existed between reasonable and ordinary wear and tear through use of the properties as a hotel, and that which might reasonably have been expected from their use as army barracks.

Whether, in arriving at the amount of damages for which the Government was liable under the lease, the line for measuring the excepted wear and tear be drawn at use of the properties as a hotel or at use as army barracks, the evidence does show that there was added or abnormal damage due to Army occupancy and use, most of it in 1942, and we have so found. We do not understand that the respondent contends otherwise. From the testimony of petitioner Turchin and other evidence of record, however, we think it clear that most, if not all, of the damage complained of was damage over and above that which might reasonably and ordinarily have been expected from the use to which the properties were put, namely, as army barracks, and as to that damage, the lessors, even under the theory now advanced, were fully indemnified under the lease. In the first place, the abnormal

damages suffered may not be attributed to those furnishings which would be most likely to suffer abnormal damage, since, in the main, those furnishings were removed and were not subjected to army use. Also, as noted in our findings, the damage complained of was, to a substantial extent, due to the fact that facilities for proper maintenance by the troops in the course of their occupancy were never fully adequate, and as to this, there was full and complete indemnity under either interpretation of the wear and tear clause of the lease. Furthermore, the claim is, to a great extent, based upon criticism by the petitioners of the reports by army inspectors as to the condition of the premises when taken over by the Army under the lease. The tenor of the criticism is that the condition of the hotel as reflected in the reports was not a true statement of condition at the time of Army entry, but rather a reflection of condition after it had been subjected to the wear and tear of Army occupancy, a necessary implication being that the reports not only did not reflect the true condition as of the dates of the reports, but, also, that the inspections may well have been made subsequent to the dates shown, and after the Army had occupied the hotel for some period. Each of the Statements of Condition comprising the report shows the date on which the particular inspection was made, and the date shown is at or prior to the time of entry by the Army under the lease. The reports were all subscribed and sworn to by the inspectors and, so far as shown, it cannot be said that the inspectors were without qualifications to do the job to which they were assigned, or that they failed to do the tasks to which they were assigned honestly and conscientiously. It may well be reasoned that they could more readily make objective reports on the condition of the hotel on the dates of inspection than petitioners Schwinger or Turchin, or their manager, Atherton.

Whatever the amount representing actual wear and tear, due to use of the hotel as army barracks, over and above that which might reasonably and ordinarily have been sustained from use of the properties as a hotel, the petitioners have not, in our opinion, established their right to deduction for depreciation of any amount over and above that allowed in the respondent's determination. The amount allowed has been referred to by the parties as representing normal depreciation. From a reading of the lease, which, after all, must supply the answer to the question of the measure of the wear and tear and damage for which restoration was to be made by the Government as part of the consideration for use of the hotel, we think it clear that normal wear and tear is as apt an expression as might be used in describing the wear and tear, damage for which the Government was not to be liable; and, regardless of the disputes that may have been indulged in by the army representatives and the petitioners as to the terminology of the lease,

as to the condition of the premises at the time of Army entry, and as to the amount reasonably and properly representing the cost of restoration at the time of surrender, we think it clear that, by the terms of the lease, the lessors at all times had the right to restoration of the hotel properties for all damage due to Army occupancy and use beyond normal wear and tear, and the petitioners throughout 1942 and at all times thereafter persisted in their claim of right to indemnification under the lease as so interpreted.

By way of corroboration, it is noted that in so far as the record shows the lessors were in the end indemnified in full for the damage upon which their claim is here based. The settlement agreement, if it was reduced to writing, was not placed in evidence. We are accordingly uninformed as to its terminology. We do know that at the start of negotiations the lessors were claiming that a cash settlement of $76,295.97, which amount included an allowance for 60 days' rental to cover the period of restoration, was the amount required for restoration of the property, pursuant to the terms of the lease, while army representatives were contending that the restoration liability, under the lease, was between forty and forty-five thousand dollars. Full scale and arm's-length negotiations were had and, as a result, the parties, by agreement, arrived at a figure of $59,000, which amount was paid by the Government and accepted by the lessors in full satisfaction of Government liability under the lease. There is some indication that the partnership did, up to the last, contend for a greater sum, and there is a suggestion of argument that the settlement was made under duress. It is to be noted, however, that the alternative proposed by Government representatives was that if the $59,000 which had already been agreed upon was not satisfactory, the Government desired to be informed, in order that physical restoration as called for in the lease might be started immediately. It should also be noted that the hotel was promptly reconditioned and very shortly thereafter was again in use as a resort hotel. The record is silent as to the cost of such reconditioning, and we are not advised whether the cost was more or less than the amount of the settlement; nor to what extent the reconditioning consisted of repairs, as contrasted with replacements and improvements. Certainly there is no showing that the useful life of the properties as a hotel was, in fact, shortened by the wear and tear received during Army occupancy, allowance being made for the settlement under the lease.

In passing, it is noted that petitioner Schwinger sold his interest in the hotel properties to Robinson, in the spring of 1943, and was not a member of the partnership receiving the settlement under the lease, in December of that year. That fact, however, cannot serve, retroactively, to give to the original partnership a right to a prior

year depreciation deduction, which right is not shown ever to have existed. So far as appears of record, any and all rights of restoration of the properties by the Government to which Schwinger was entitled under the lease, were part and parcel of the sale made to Robinson, and by reason of the sale, Robinson thereafter stood in his shoes.

*Decisions will be entered under Rule 50.*