Ione S. Wynne v. Commissioner.
Ione S. Wynne v. Commissioner
Docket No. 26933.
United States Tax Court
1952 Tax Ct. Memo LEXIS 272; 11 T.C.M. (CCH) 298; T.C.M. (RIA) 52090; April 3, 1952
Charles L. Kades, Esq., for the petitioner. Joseph F. Lawless, Esq., for the respondent. TURNER Memorandum Opinion TURNER, Judge: The respondent has determined a deficiency of $5,632.97 in the petitioner's income tax for 1945. The issues presented by the pleadings are the correctness of the respondent's action (1) in disallowing $820 of a deduction of $1,000 taken by the petitioner for charitable contributions and (2) in disallowing a deduction of $5,117.50 taken by petitioner as a casualty loss sustained on a cabin cruiser. On brief, the petitioner concedes issue No. (1) thus leaving for determination only issue No. (2). The facts have been stipulated and are found accordingly. *273 [The Facts] The petitioner's return for 1945, which was prepared on the cash receipts and disbursements basis, was filed with the collector at Springfield, Illinois. On or about May 1, 1941, and at a cost of $12,500, the petitioner acquired a trunk cabin cruiser named the "Silver King II." The vessel had been built in Brooklyn, New York, in 1937, was 46 feet long, had a beam of 13 feet, a draft of 4 feet and two 8-cylinder, 4-cycle engines. On April 1, 1942, the petitioner, "in accordance with the provisions" of Regulations, United States Coast Guard Auxiliary, offered the use of the vessel to the United States Coast Guard for a period of one year or for the duration of the emergency if longer, stating that the then estimated value of the vessel was $10,000. On April 11, 1942, and after an inspection of the vessel whose condition was found to be good, the Coast Guard accepted the offer of the petitioner. Thereafter the vessel was enrolled in the Coast Guard and employed by it for war purposes in accordance with the regulations mentioned. The vessel, after having been armed, was assigned for coastal picket patrol and performed this as well as general duty in waters adjacent *274 to and outside the port of Miami, Florida. On September 26, 1942, a Coast Guard officer made a survey of the vessel and appraised its value on that date at $8,000. At that time the vessel had been enrolled and operated for five months. On July 10, 1944, the District Coast Guard Officer of the Seventh Naval District designated a special board of survey to convene without delay, to determine what repairs, if any, were necessary to place petitioner's vessel in a satisfactory condition for return to the petitioner, together with the estimated cost of such work and to make report thereon. The board of survey was to contact the petitioner or her representative and endeavor to arrange for a settlement on a cash basis. It was specifically directed that consideration "be given to the value of improvements made by the Government, as well as to any decrease in value caused by Government use." The board was also directed that if differences should arise between it and the petitioner which could not be reconciled, then the board would make its recommendations and have the petitioner reduce her claim to writing and submit such claim with the board's report, but if the board and the petitioner *275 should be in agreement as to the amount of the settlement, a statement to that effect, in writing over the petitioner's signature should be included in the board's report. On July 12, 1944, the board of survey convened and inspected petitioner's vessel. It found that no improvements had been made by the Government to the vessel after it was enrolled in the Coast Guard. After considering its findings in conference with the petitioner's agent or representative the board estimated at $2,301.33 the repairs necessary to place the vessel in a satisfactory condition for return to the petitioner. On the same day, July 12, 1944, the board made its report recommending that $2,301.33 be paid to the petitioner and the petitioner agreed in writing to settlement in that amount, which was paid to her on said day. On or about July 14, 1944, the vessel was laid up from active patrol and general duty service and returned to the petitioner. After the vessel was returned to the petitioner, and so far as shown, before any of the repairs found necessary by the board of survey were made, insurance underwriters on July 31, 1944, determined that the vessel was not seaworthy and refused to insure it against *276 marine risks. On or about March 1, 1945, the petitioner sold the vessel for $4,250. Subsequently and on March 12, 1945, Edwin P. LeMay, a marine surveyor, appraiser and claim adjuster of Miami, was retained by the petitioner to make an independent estimate of necessary repairs to restore the vessel to yachting condition. Concluding that the vessel had seen "tough service" and that it was in a leaking and unseaworthy condition, he valued it at $3,000 and estimated that an expenditure of at least $7,500 would be required to repair it and install new equipment. In arriving at the foregoing amounts, it was his opinion that the estimated cost of putting the vessel "in a satisfactory condition for return to the owner," which he regarded as the test employed by the Coast Guard in the case of vessels of this type, was not the same as the cost of restoring the vessel to the same yachting condition it was in when turned over to the Coast Guard; that a vessel may be made seaworthy at less cost than required to put it in shape as a yacht; and that the estimates of cost made by the board of survey with respect to the petitioner's vessel were substantially less than the amounts required to make *277 it seaworthy and must have been based on rates of labor far below those prevailing in the Miami area during 1944 and 1945. In her income tax return for 1945, the petitioner took a deduction of $5,117.50 as a casualty loss sustained in that year on the Silver King II. In determining the deficiency, the respondent disallowed the deduction in full. On brief, the petitioner now claims only $3,448.67 as the amount of the loss, that amount being the $10,000 at which she valued the vessel at the time it was taken over by the Coast Guard, reduced by the $2,301.33 received in 1944, in settlement of her claim against the Coast Guard, and the $4,250 received by her in 1945 upon the sale of the vessel. [Opinion] The issue on which the case was submitted presents two questions, (1) whether the loss, if any, which the petitioner here seeks to deduct was sustained by her in 1945, and (2), if so, whether it was a casualty loss, within the meaning of section 23 (e) (3) of the Internal Revenue Code, [1] and therefore deductible. That the petitioner ultimately, and in any event not later than 1945, when the vessel was sold, sustained a loss, is not here in dispute. There *278 is no claim, however, that such loss as was sustained by the petitioner was sustained in a transaction entered into for profit within the meaning of section 23 (e) (2), and the petitioner specifically disavows any claim that she is here seeking to deduct any loss sustained by reason of the sale of the vessel in 1945. Her claim is that the loss here sought to be deducted was a loss resulting from the abnormal and heavy usage of the vessel by the Coast Guard in offshore patrol work in 1942, 1943 and 1944 and, since such usage was in the course of the prosecution of the war, that the loss resulting therefrom was a casualty loss within the meaning of section 23 (e) (3), supra. While, as noted, she does not claim that the loss she seeks to deduct was sustained by reason of the sale of the vessel in 1945, she contends that the loss is deductible in 1945, rather than in 1944, for the reason that "she did not know with reasonable certainty how much she would recover until 1945," when she sold the vessel. *279 We do not know the exact terms of the taking of the Silver King, except that it was taken "in accordance with the provisions" of the Regulations of the United States Coast Guard Auxiliary. It is apparent, we think, from the presentation of the case that nothing was paid or to be paid by the Government for the use of the vessel. On the other hand, it is definite that there was a recognized liability to place the vessel, at the end of its period of service, "in a satisfactory condition for return" to the petitioner and that in determining the amount of the allowance to be made for restoring the vessel to such satisfactory condition "consideration" was "to be given * * * to any decrease in value caused by Government use," even though it was LeMay's opinion that the "satisfactory condition for return to the owner" test as used by the Coast Guard for vessels of the type here was not the same as the restoration of a vessel "to the same yachting condition as it was in when turned over to the Coast Guard." However that may be, the facts show that the Silver King did suffer substantial damage during the period it was in use by the Coast Guard, and if the damage resulted in a casualty loss *280 within the meaning of the statute, the petitioner is entitled to a deduction therefor in some year. Under the statute, such losses, when "not compensated for by insurance or otherwise," are deductible in the year sustained. As far as the vessel itself was concerned, the damage to it occurred during the period of its use by the Coast Guard and was complete on or before July 14, 1944, when the vessel was laid up from active patrol and returned to the petitioner. It thus appears that, de facto, the loss, whatever the amount, had been sustained at or prior to that time. Having been sustained, it was deductible to the extent "not compensated for by insurance or otherwise." At that time, however, the petitioner had an admitted and acknowledged right to be compensated to some extent, if not in full. The amount to which she was compensated under that right was fixed, determined and concluded by an agreement between the petitioner and the Coast Guard representatives in July of 1944, at $2,301.33, and that amount was paid to the petitioner and received by her as full and complete satisfaction of her claim. It would appear, therefore, that as of that date the transaction with the Government for *281 the use of the vessel, as the result of which the damage had occurred, was completed and finally closed and if the petitioner ever sustained any loss by reason of such usage, over and above the amount for which she was compensated, that loss had been sustained by that time and, if deductible at all, was then deductible. Section 23 (e) (3) makes no provision for deduction in one year of losses sustained in another year. Commissioner v. Harwick, 184 Fed. (2d) 835, affirming an unpublished decision of the Tax Court, though relied on by the petitioner, supports the conclusion reached. In that case, the loss resulted from a shipwreck which occurred in 1943. The taxpayer claimed the right to be compensated therefor by insurance. The insurers neither admitted nor settled their liability until 1944, when partial liability was agreed to and satisfied. It was held that 1944 was the year of the loss. Until 1944 the existence of the loss was as to the taxpayer still an open question. Prior to 1944, he did not know whether or to what extent he had a right to be compensated for the damage which had occurred. To the same effect is The Allied Furriers Corporation, 24 B.T.A. 457. *282 Compare Charles D. Whitney, 13 T.C. 897. See also Ben Turchin, 16 T.C. 1183. In the instant case, all of the damage causing the loss occurred in 1942, 1943 and 1944, and the settlement between the petitioner and the Government was completed and closed in 1944. Any loss occasioned by the Coast Guard's use of the vessel, over and above the amount received in payment from the Government, then became a sustained loss "not compensated for by insurance or otherwise." The subsequent sale of the vessel is a wholly separate transaction upon which the petitioner may have suffered loss or realized gain, dependent upon the basis of the vessel to her for gain or loss purposes. Since the loss, whether deductible or not, was sustained in 1944, it becomes necessary to consider and determine whether or not it was a casualty loss within the meaning of section 23 (e) (3), supra. Decision will be entered under Rule 50. Footnotes
1. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: * * *
(e) Losses by Individuals. - In the case of an individual, losses sustained during the taxable year and not compensated for by insurance or otherwise - * * *
(2) if incurred in any transaction entered into for profit, though not connected with the trade or business; or (3) of property not connected with the trade or business, if the loss arises from fires, storms, shipwreck, or other casualty, or from theft. No loss shall be allowed as a deduction under this paragraph if at the time of the filing of the return such loss has been claimed as a deduction for estate tax purposes in the estate tax return.↩